MEREDITH CORPORATION AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 13165–91, 17091–91.     Filed March 14, 1994.

*James L. Malone III, Gary C. Karch*, and *Lydia R.B. Kelley*, for petitioner.

*Lawrence C. Letkewicz* and *Dana Hundrieser*, for respondent.

NIMS, *Judge*: Respondent determined deficiencies in Federal income tax with respect to petitioner's fiscal year ended June 30, 1986 (FYE 1986), in the amount of $6,466,674.82, and with respect to petitioner's fiscal year ended June 30, 1987 (FYE 1987), in the amount of $11,493,459. In addition to contesting these deficiencies, petitioner claims overpayments in Federal income tax with respect to FYE 1986 in the amount of $4,760,484 and with respect to FYE 1987 in the amount of $5,033,291.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

These cases were consolidated for trial, briefing, and opinion. Following concessions, the issues for decision are the amounts of the amortization deductions under section 167, if any, to which petitioner is entitled with respect to three intangible assets acquired upon its purchase of the assets of Ladies' Home Journal (LHJ). These intangible assets consist of (1) an employment relationship with the editor-in-chief of LHJ, (2) noncompetition agreements, and (3) LHJ's subscriber relationships.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioner is an Iowa corporation having its principal place of business at 1716 Locust Street, Des Moines, Iowa 50336. It is an accrual basis taxpayer which keeps its books and records, and files its Federal income tax returns, on a fiscal year ending June 30.

Petitioner is a diversified media company involved in magazine and book publishing, television broadcasting, real estate marketing/franchising and, until recently, printing. In 1985, petitioner published, among other things, the following magazines: Better Homes and Gardens, Successful Farming, Country Homes, Metropolitan Home, Midwest Living, and SAIL.

LHJ, founded in 1883, is one of a group of magazines commonly referred to in the magazine industry as "the Seven Sisters". The other members of the Seven Sisters are Better Homes and Gardens (founded in 1922), Good Housekeeping (founded in 1885), McCall's (founded in 1876), Woman's Day (founded in 1937), Family Circle (founded in 1932), and Redbook (founded in 1903). Each of the Seven Sisters tends to compete for similar kinds of women readers and similar kinds of advertisers. The Seven Sisters reached a plateau in total circulation in 1966 and in total advertising pages and total advertising revenue in 1977. After those dates, increases in circulation or advertising market share of any one of the Seven Sisters were generally achieved only at the expense of another.

Family Media, Inc. (FMI), a New York corporation, purchased LHJ from Charter Publishing in August 1982, for $12 million. FMI continued to publish LHJ until January 3, 1986, when it sold LHJ to petitioner. In 1985, FMI published the following magazines: LHJ, Golf Illustrated, Savvy, 1001 Home Ideas, Health, The Homeowner, and World Tennis. From 1980 until 1986, Robert Riordan was the president of FMI as well as its principal shareholder, owning approximately 83 percent of its outstanding common stock.

Charter Publishing sold LHJ in 1982 because it was not profitable and because Charter Publishing had decided to

terminate its involvement in the magazine business. Riordan was interested in buying LHJ in 1982 because it was a large circulation magazine which had been around a long time and which he considered to have a great name, a strong reputation, and a good editor-in-chief. Most importantly, he believed, it was a publication which could be made profitable. FMI's operating philosophy was to acquire underperforming publications and improve them through increases in advertising revenue, circulation, and prices.

Under Riordan's direction, FMI employed a number of strategies which helped in making LHJ more profitable. These strategies included the following:

(a) Gradually increasing the price of a 1-year subscription from $11.97 to $20;

(b) offering subscribers the opportunity to renew their subscriptions at the existing price prior to a price increase;

(c) utilizing sweepstakes promotions as part of its direct mail effort;

(d) making selective temporary reductions in the single-copy prices of LHJ in order to introduce more newsstand readers to the magazine;

(e) maintaining the full advertising and editorial budget which Charter Publishing had established for LHJ; and

(f) purchasing data from Simmons Market Research Bureau, Inc., regarding the number and type of people who read and remembered LHJ, which data facilitated advertising sales.

In October 1985, an investment banker contacted Robert Burnett, then petitioner's president and chief executive officer, regarding whether petitioner would have any interest in purchasing some or all of the magazines being published by FMI. Following an initial meeting, petitioner's senior staff members conducted due diligence. After a series of meetings, petitioner indicated that it was willing to pay in the range of $100 million for FMI's magazines. FMI indicated early in the negotiations its willingness to receive roughly 80 percent of the proposed purchase price in cash and the remaining 20 percent in the form of a note.

On November 11, 1985, officers of petitioner presented a recommendation to its board of directors that petitioner proceed with negotiations to purchase LHJ and Health. Petitioner's board of directors approved this recommendation and

authorized a purchase price for the assets of both magazines not to exceed $105 million. Prior to November 21, 1985, petitioner conducted an analysis of the projected revenues and expenses of the magazines in years following the proposed acquisition in order to determine whether a purchase price of $100 million was within a reasonably prudent range. Petitioner concluded from this analysis that a purchase price of $100 million was within a reasonable range. Negotiations between petitioner and FMI continued until November 21, 1985, when the proposed acquisition by petitioner was announced to the public.

Petitioner provided FMI with a letter of intent dated November 21, 1985, which was accepted and agreed to by FMI, confirming petitioner's intention to purchase the assets of LHJ and Health for $96 million, less cash of $2.8 million, and subject to the assumption of certain liabilities. The letter of intent set conditions precedent to the closing of the proposed purchase which included the absence of any material adverse change in the condition of the LHJ assets and the execution of a satisfactory consulting agreement and 5-year covenant not to compete between Riordan and petitioner.

On December 23, 1985, petitioner entered into an agreement for the purchase and sale of LHJ (the purchase agreement), but not Health. The purchase agreement stated that petitioner would acquire all the assets, except those specifically excluded by the terms of the agreement, of LHJ for a purchase price consisting of $74 million cash, an $18 million deferred payment obligation, and the assumption of certain liabilities and obligations of FMI. The purchase agreement set conditions precedent to the closing of the purchase which included (1) the lack of any "change in the Business, taken as a whole, its financial condition or prospects which would have a material adverse effect thereon," (2) the execution of 5-year covenants not to compete between Riordan and petitioner and between FMI and petitioner, and (3) the execution of a consulting agreement between Riordan and petitioner. The terms of the $18 million installment note indicated that it was specifically in exchange for the sale by FMI to petitioner of its interest in the LHJ trademarks. The sale was closed on January 3, 1986.

Paragraph 2.1 of the purchase agreement specified the details of the consideration to be paid by petitioner and

stated that such consideration was being paid for the "Purchased Assets". Paragraph 1.2 set forth a detailed list of the "Purchased Assets", which included, in part, "all subscription lists both for active and, to the extent maintained by Seller or its fulfillment company, expired subscribers". The only reference in this paragraph to employment relationships or agreements stated that purchased assets included:

Rights under agreements with employees concerning confidentiality and the assignment of rights to manuscripts, story ideas, editorial materials, employee names or other publication materials whether or not copyrighted or otherwise protectable under the U.S. or foreign patent, trademark, copyright or similar laws.

The listing of purchased assets made no reference to noncompetition agreements.

A handwritten document entitled "LHJ Acquisition Opening Balances", as of January 3, 1986, prepared by petitioner, provided as follows:

*Assets*

| | | |
|---|---:|---:|
| Accounts receivable: | | |
| Direct-to-publisher | $6,878,089 | - - - |
| Paid-[illegible]-services | 3,352,045 | $10,230,134 |
| Reserve for doubtful accounts-DIP | - - - | (3,394,223) |
| Inventory: | | |
| Manuscripts | 667,081 | - - - |
| Art and photo | 257,172 | - - - |
| Res for obsolete | (12,000) | 912,253 |
| Paper | - - - | 4,273,089 |
| Prepaid: | | |
| Jan. 1986 supplement copies | - - - | 240,673 |
| Circulation materials | - - - | 430,643 |
| Deposits leased autos | - - - | 5,100 |
| Fixed assets—furniture and equipment | - - - | 368,761 |
| Long term sub a/r agency P.D.S. | - - - | 1,159,009 |
| Goodwill and other intangibles: | | |
| Subscription list | 30,270,000 | - - - |
| Noncompete—Riordan | 10,000 | - - - |
| Trademark | 17,884,231 | - - - |
| Goodwill | 76,648,567 | 124,812,798 |
| Total assets | - - - | 139,038,237 |

## *Liabilities*

| Accounts payable: | | |
|---|---|---|
| Paper | - - - | $2,776,762 |
| Art and editorial | - - - | 159,358 |
| Fulfillment obligation | - - - | 46,867,886 |
| Total liabilities | - - - | 49,804,006 |
| Stock and paid-in capital | - - - | 89,234,231 |
| Total liabilities and equity | - - - | 139,038,237 |

An audited financial statement prepared with respect to LHJ, as a division of FMI, by the accounting firm of Grant Thornton & Co. indicated 1985 revenues for LHJ of $114,059,960 and pretax earnings from operations of $9,129,249. The Grant Thornton financial statement also showed, as of December 31, 1985, fixed assets, net of depreciation and amortization, in the amount of $897,803 and working capital in the amount of $10,716,171. A pro forma allocation of LHJ's 1985 revenues and expenses done by Michael Sell, petitioner's treasurer, determined operating income before income taxes of $12,079,981.

By December 23, 1985, Riordan had advised petitioner that he intended to liquidate FMI after the closing of the LHJ sale. On January 3, 1986, FMI's board of directors voted to adopt a plan of complete liquidation under the provisions of section 337 in effect prior to amendment by secs. 631(a) and 633 of the Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2269, 2277. The remaining assets of FMI, following certain additional sales of assets, were distributed to its shareholders with the $18 million deferred payment obligation being transferred to a trust established for the benefit of the shareholders. The stock of the FMI subsidiaries owning Golf Illustrated, World Tennis, and Savvy was distributed to Riordan.

The net cash received by FMI at closing, after adjustments and payments to certain of its creditors, was $54,791,769. As an 83-percent shareholder, Riordan would have been entitled to receive approximately $45,500,000 of this amount upon the liquidation of FMI.

*Myrna Blyth Employment Relationship*

Myrna Blyth was hired as editor-in-chief of LHJ (as above stated, then owned by Charter Publishing) on April 22, 1981, replacing Lenore Hershey, who had been editor-in-chief since 1974. Prior to her employment at LHJ, Blyth was the executive editor and a vice president at Family Circle magazine. She had previously served as senior editor at Family Health (now Health magazine) and as senior editor at Ingenue magazine. Blyth was also the author of two novels: "Cousin Suzanne", published in 1975, and "For Better and For Worse", published in 1979.

Charter Publishing approached many people regarding the LHJ editor-in-chief position. Forty applicants were interviewed and considered before Charter selected Blyth. As part of the interview process, Blyth proposed a plan for the future of LHJ, examined past issues and rated the audience appeal of the features, and proposed ideas for changing the attitude and tone of the magazine. There were three final contenders for the position: Ellen Levine, who later became the editor of Redbook; Elizabeth Crowe, who was at the time the editor of Parents' Magazine; and Blyth.

Blyth entered into an employment contract with Charter Publishing which called for an annual salary of $100,000 plus a bonus. The first issue of LHJ which Blyth was responsible for as editor-in-chief was the September 1981 issue.

When Blyth became editor-in-chief in 1981, LHJ was ranked seventh among the Seven Sisters in both number of advertising pages sold and gross advertising revenues and fifth in average readers per copy. Blyth replaced LHJ's art director within a few months of becoming editor-in-chief and most of its senior editors within a few years. Ultimately, she replaced nearly everyone on LHJ's editorial staff.

As editor-in-chief, Blyth had overall responsibility for the editorial content of LHJ and served as spokesperson for LHJ on topics of national interest. A typical day for Blyth as editor-in-chief was to plan service features for issues 6, 7, and 8 months in advance, discuss fine-tuning photographs for an issue 5 months in advance, prepare layouts for an issue 4 months in advance, and put finishing touches on an issue 3 months in advance. Blyth used her "Editor's Journal" column to engage readers in a dialogue. In the September 1981

issue, she used the column to introduce herself and to explain what she wanted to do with LHJ. Blyth also spent much of her time with advertisers, often giving presentations to advertising clients and agencies regarding the changes she was making to LHJ. Blyth and Robert Thomas, then publisher of LHJ, traveled to different cities to talk to advertisers about their new vision for LHJ.

As editor of LHJ, Blyth was determined to be informative, journalistic, and inspiring and made changes which distinguished the Blyth-edited LHJ from that edited by her predecessor. Blyth increased the reality of the LHJ articles and service features by including articles on such topics as working and stay-at-home mothers, rape, child abuse, test-tube babies, breast cancer, child pornography, the "100 Most Important Women in America", and women in the military. Blyth also substantially increased the number of issues appearing with celebrities on the covers. Under Blyth's leadership, LHJ won many awards, including an Emma award from the Women's Political Caucus, an award from the New York Women's Press Club, and the Clarion Award for community service journalism from Women in Communications, Inc. In 1984, LHJ was named Magazine of the Year by the American Society of Journalists and Authors, the first women's service magazine to ever win such an award.

According to figures compiled by Simmons Market Research Bureau (Simmons figures relate to individuals who read and remember a referenced publication), LHJ's adult readers per copy increased from 2.58 in 1981 to 2.64 in 1982, an increase of 2.3 percent, and women readers per copy increased from 2.27 in 1981 to 2.34 in 1982, an increase of 3.1 percent. The readers per copy of McCall's, Redbook, and Woman's Day declined during the same period and, as a result, LHJ rose from fifth to second in average readers per copy among the Seven Sisters. This improvement had a positive impact on LHJ's advertising sales for 1983. In 1985, LHJ's average adult readers per copy was 2.73 and women readers per copy was 2.46. As of 1985, LHJ was fourth among the Seven Sisters in average readers per copy.

LHJ's monthly newsstand sales went from approximately 800,000 per month for the 6-month period ended June 30, 1982, to approximately 1 million for the 6-month period ended June 30, 1984, and to approximately 1,060,000 for the

6-month period ended December 31, 1985. This improvement occurred in part because of pricing changes made by Riordan and in part because of improvements in the editorial product.

According to the Publisher's Information Bureau (PIB) for the years 1981 through 1985, LHJ's share of the Seven Sisters advertising market, as measured by standard rate advertising revenues, was as follows:

| *Year* | *Percentage* |
| --- | --- |
| 1981 | 9.0 |
| 1982 | 7.8 |
| 1983 | 9.2 |
| 1984 | 9.6 |
| 1985 | 10.5 |

An employment agreement between FMI and Blyth was entered into on December 1, 1983, for a 5-year term expiring on November 30, 1988 (the Blyth employment agreement). The compensation provided for by the Blyth employment agreement included a salary of $150,000 in the first year, increasing $25,000 per year thereafter, plus annual bonus and incentive compensation. Depending upon certain performance criteria, the bonus could be as large as 45 percent of Blyth's base salary.

The Blyth employment agreement included a restrictive covenant precluding Blyth from competing at another Seven Sisters publication for 2 years if she left LHJ before her contract expired or if she failed to consent to any assignment of the contract allowable under its terms. The Blyth employment agreement also prevented Blyth from recruiting any LHJ personnel away from LHJ for 1 year beyond a termination or the expiration of the agreement. The Blyth employment agreement could not be renewed unilaterally beyond its stated 5-year term at the option of Blyth, FMI or any assignee of the contract. However, the agreement required Blyth and FMI to hold discussions as soon as convenient during the fifth year to determine whether the agreement should be extended and the terms of any extension.

The Blyth employment agreement provided that it was only assignable to an assignee of the LHJ operating assets and that such assignment was only permitted with Blyth's consent. In the event Blyth did consent to such an assignment, she was entitled to receive, as a bonus, $100,000 for

each 12-month period of her employment completed after such assignment and within the term of the Blyth employment agreement. FMI's obligation to make this additional bonus payment was to be secured by a letter of credit. By letter dated January 3, 1986, Blyth consented to the assignment of her contract to petitioner. Pursuant to the assignment and assumption agreement executed by FMI and petitioner, petitioner agreed to assume all of FMI's obligations under the Blyth employment agreement other than the assignment bonus due Blyth for consenting to the assignment.

Blyth was not consulted by any officer, director, employee or representative of FMI or petitioner about the proposed sale of LHJ to petitioner. Blyth found out about the sale approximately one-half hour before the public announcement on November 21, 1985. The only persons at FMI who knew about the proposed sale prior to November 21, 1985, were Riordan; Michael Feirstein, FMI's general counsel; Michael Brennock, FMI's chief financial officer; and Marty Gitow, a vice president of FMI.

During negotiations, petitioner requested that the sale of LHJ be made contingent upon Blyth's consenting to the assignment of her contract. FMI made clear to petitioner that it would not allow the completion of the sale to be contingent upon the continued employment of any LHJ employee. However, as of December 1985, both petitioner and FMI expected Blyth to consent to the assignment of her contract.

Blyth did not renegotiate her salary or any other aspect of her compensation or benefits with petitioner between November 21, 1985, and January 3, 1986. Petitioner did not pay and was not requested to pay any inducements to Blyth so that she would agree to continue in her capacity as editor-in-chief of LHJ. The compensation received by Blyth for her services was fair as of the end of 1985 based upon the prevailing market at that time, and Blyth was satisfied with the compensation she was receiving. Immediately following the acquisition of LHJ by petitioner, Blyth was petitioner's third highest paid employee.

As of late 1985, there were no employees at LHJ who could have replaced Blyth had she terminated her employment. Blyth could have been replaced by hiring an editor from another magazine, but not without some risk that such editor

would be less successful than Blyth. Blyth was in her midforties as of the end of 1985.

During the period from 1981 through 1992, McCall's had four editors, Redbook had four editors, Woman's Day had three editors, Family Circle had two editors, and Better Homes and Gardens had two editors. Changes in editors generally result from poor performance, promotions, or departures to other magazines.

*Noncompetition Agreements*

As a condition precedent to the purchase of LHJ, Riordan and FMI executed noncompetition agreements with petitioner, dated January 3, 1986 (the noncompetition agreements). The noncompetition agreements prevented Riordan and FMI from competing directly or indirectly against LHJ and other publications owned by petitioner for a period of 5 years from the date the LHJ assets were purchased by petitioner. Each of the noncompetition agreements provided a $10 million cap on damages for breach of their restrictions.

Paragraph 2 of the FMI noncompetition agreement reads as follows:

2. *Consideration.* In consideration of the undertakings of Family as set forth in Section 1 above, Meredith Acquisition Company is making a payment to Family in an amount equal to $10,000, receipt of which is hereby acknowledged.

Petitioner paid FMI $10,000 for its execution of the FMI noncompetition agreement. Paragraph 2 of the Riordan noncompetition agreement reads as follows:

2. *Consideration.* In consideration of the undertakings of Riordan as set forth in Section 1 above, Meredith is making (i) direct payments to Riordan pursuant to a Consulting Agreement and (ii) indirect payments to Riordan in an amount equal to $10,000 which is attributable to a liquidating distribution which will result from payments made by Meredith Acquisition Company under the Agreement between Meredith and Family dated as of December 23, 1985.

The "undertakings" contained in section 1 of the Riordan noncompetition agreement do not include the fulfillment of consulting duties.

By the time the purchase price for the LHJ assets was established, the general concept of the noncompetition agree-

ments had also been established as part of the deal. The term, scope, and damages provisions of the noncompetition agreement were negotiated in detail during the negotiating sessions relating to the sale of LHJ. However, subsequent to his initial meeting with Burnett, Riordan did not participate in any of these negotiating sessions.

Petitioner believed that the Riordan noncompetition agreement was the more important of the two agreements and that the FMI noncompetition agreement was principally conceived and executed so that Riordan could not compete indirectly through FMI. However, petitioner also intended to prevent FMI, without Riordan, from competing against LHJ and certain of petitioner's other publications.

On January 3, 1986, petitioner and Riordan entered into a consulting agreement pursuant to which Riordan agreed to provide consulting services to petitioner during the first 6 months of petitioner's ownership of LHJ (the consulting agreement). The stated consideration was $100,000, to be paid to Riordan in six equal monthly installments. The consulting agreement did not explicitly state the matters upon which Riordan was to consult with petitioner, but provided that Riordan had promised to petitioner "half [Riordan's] time for six months." However, the only consulting services provided to petitioner by Riordan pursuant to this agreement consisted of a single meeting with petitioner's circulation personnel in Des Moines in March 1986.

Riordan began his career as a direct mail copywriter with Esquire. He thereafter worked for McGraw-Hill, GQ, and Coronet. In 1961, he went to Conde Nast (publisher of Vogue, House and Garden, Glamour, Mademoiselle, and Bride's) as subscription sales manager. In 1965, he became Newsweek's circulation manager, and in 1971, he became circulation director. In 1975, he became senior vice president of Newsweek. He left Newsweek in 1977 to form his own consulting business. In 1978, he began employment as president of FMI and became a member of the FMI ownership group. In 1986, Riordan was 56 years old and in good health.

Riordan initiated a discussion with the owners of McCall's magazine in the summer of 1985 regarding a potential acquisition. However, the owners of McCall's indicated that they were not interested in selling the magazine. At that time, Riordan was contemplating whether to expand his

operations by acquiring a second Seven Sisters magazine or sell LHJ and diversify his wealth.

As of the end of 1985, Riordan intended to move to Florida and be an absentee owner of the magazines that he owned at that time. He was considering permanent retirement but had not ruled out the possibility of purchasing and selling magazine properties in the future. These intentions were communicated to petitioner.

At the end of 1985, Riordan knew a great deal about LHJ, including its general business plan, statistics, methodologies relating to income streams, newsstand distribution policies, pricing structures, print order figures, sell-through rates, number of copies sent to a particular city market or retailer, major advertisers, advertising pricing structures, discounts, general weaknesses, direct mail strategies, most responsive lists, response rates, successful offer mail dates, use of agencies, and remit rate.

It was reasonable for petitioner to have expected, as of January 3, 1986, that one or more of the other Seven Sisters would become available for purchase within the ensuing 5-year period.

*LHJ Subscriber Relationships*

As of January 3, 1986, LHJ had 3,752,655 subscribers who were entitled to a February 1986 issue. These subscribers consisted of 2,271,839 first-time subscribers and 1,480,816 renewed subscribers. As of the same date, 5,217,347 new or first-time subscribers would be necessary to generate sales of the same number of initial term and renewal subscription copies of LHJ as the 3,752,655 existing subscribers acquired by petitioner.

The Audit Bureau of Circulations (ABC) is a nonprofit organization established in 1914 which is owned by advertising agencies and publishers. Its purpose is to disseminate circulation data concerning magazines and newspapers. Each member-publisher is required to file two circulation statements per year, one for the period ended June 30 and another for the period ended December 31. ABC audits these statements and issues annual audit reports. In 1985, ABC had approximately 5,000 members, including LHJ.

For the years 1982 through 1986, LHJ reported to ABC that LHJ sold subscriptions for varying terms as follows:

*Term (in months)*

| Year | 1-11 | 12-35 | 36-59 | 60 | | | Total |
|------|------|-------|-------|-----|---|---|-------|
| 1982 | 45,352 | 3,658,142 | 186,735 | 58,429 | - - - | - - - | 3,948,658 |
| 1983 | 2,159,333 | 849,911 | 105,656 | 105,673 | - - - | - - - | 3,220,573 |
| 1984 | 2,723,640 | 1,768,176 | 90,559 | 137,772 | - - - | - - - | 4,720,147 |
| 1985 | 3,729,718 | 1,601,293 | 75,899 | 113,096 | - - - | - - - | 5,520,006 |
| | *1-6* | *7-12* | *13-24* | *25-36* | *37-48* | *49* | |
| 1986 | 9,221 | 3,211,739 | 635,295 | 130,947 | 105,531 | 175,384 | 4,268,117 |

LHJ obtained approximately 55 percent of its new subscribers through direct mail solicitation and approximately 45 percent through subscription agents who marketed on behalf of LHJ.

Magazines such as LHJ accumulate a great amount of statistical information about their subscribers so that the circulation department can market more effectively to new subscribers, maintain subscribers, and forecast renewals. The information that a magazine retains regarding its subscribers includes, but is not limited to: (1) Name and address, (2) the date upon which the subscriber ordered a subscription, (3) the amount the subscriber paid, (4) the length of the subscription, (5) the source of the subscription (direct mail or agent), (6) the number of times the subscriber renewed, (7) the effort expended to accomplish renewal, (8) the subscriber's method of payment, (9) the billing effort required to receive payment, (10) whether there were duplicate orders, and (11) whether the subscriber gave a gift subscription. All of the information regarding subscribers, taken together, indicates that if certain criteria are met, a certain probability of renewal occurs.

Subscribers who renew for the first time are referred to as "converted" subscribers and thereafter are referred to as "renewing" subscribers with respect to all subsequent renewals. LHJ's subscription experience indicated that approximately 33 percent of new subscribers would convert and 72 percent of converted and renewed subscribers would continue to renew upon expiration of their subscriptions. On average, LHJ was required to obtain 215,000 new subscribers per month in order to prevent its subscriber base from decreasing.

Although there were approximately 80 million households in the United States during 1985 and 1986, for purposes of LHJ's direct mail solicitation of new subscribers there were only approximately 30 million mailable households during these years. LHJ generally attempted to solicit only households which included an adult woman fitting a certain demographic profile with respect to age, income, and education.

LHJ's direct mail solicitation in 1985 included a mailing of approximately 2 million pieces per month over a period of 3 months. The net response rate with respect to this mailing was approximately 5.5 percent. In June through November of 1986, LHJ did a mailing of approximately 16 million pieces with a net response rate of approximately 1.9 percent. LHJ did an additional mailing in December of 1986 which consisted of approximately 2.7 million pieces and produced a net response rate of approximately 2.8 percent.

In October 1985, the Federal Trade Commission (FTC) raised questions regarding whether the form of LHJ's 1985 direct mail solicitations violated the Federal Trade Commission Act. Petitioner was aware of this inquiry prior to January 3, 1986. As a result of the FTC inquiry, the June through November 1986 direct mail solicitations were of a different form than the 1985 solicitations. This change in form, in combination with the size of the 1986 mailing, resulted in a decreased net response rate for the 1986 direct mail solicitations as compared to the 1985 solicitations. In general, a very large direct mail solicitation will result in a lower net response rate. LHJ has never mailed more than 25 million pieces of subscriber solicitation mail in a single year. If LHJ were to mail more than 25 million pieces in a year, the cost per new subscriber would increase substantially. An industry average for direct mail net response rates was approximately 2 percent.

FMI earned revenues of $955,982 in 1984 and $933,053 in 1985 from rentals of its list of LHJ subscribers.

As a general practice, each new issue of LHJ is mailed to subscribers beginning on the 15th day of the month preceding the issue month (e.g., the October issue is generally mailed beginning on September 15). Each issue of LHJ generally appears on newsstands beginning on the 15th day of the preceding month.

As of January 3, 1986, any LHJ subscriber who canceled a subscription to LHJ acquired and paid for before January 3, 1986, was entitled to receive a cash refund from FMI of the pro rata portion of the subscription price paid and attributable to unmailed copies of the magazine. The obligation associated with this refund policy is referred to as "subscription liability".

The terms of the purchase of the LHJ assets allowed FMI to retain all payments received from subscribers with respect to existing subscriptions and provided that FMI would remain solely liable to make any cash refunds to existing subscribers who canceled their subscriptions. However, petitioner agreed to assume FMI's obligation to produce and deliver copies of LHJ to existing subscribers. This obligation is referred to as a "fulfillment obligation". Petitioner acquired entitlement to all advertising revenue from sales of advertisements appearing in all issues of LHJ published after the date of closing.

At the time of the purchase, petitioner determined for book purposes that the dollar amount of the fulfillment obligation that it had assumed was $46,867,886. This amount was calculated based upon an estimate of 54,886,856 copies to be delivered pursuant to existing subscriptions at a projected cost of $0.8539 per copy. This projection included costs allocable to producing the advertising content contained in the issues to be delivered to existing subscribers.

For the fiscal years ended June 30, 1986, through June 30, 1991, the editorial costs (excluding costs allocated to publishing the advertising portion of the issues of LHJ) incurred by petitioner for copies of LHJ delivered and sold pursuant to its assumption of FMI's fulfillment obligation were as follows:

| FYE | Editorial costs |
| --- | --- |
| 6/30/86 | $8,324,660 |
| 6/30/87 | 7,827,573 |
| 6/30/88 | 2,869,118 |
| 6/30/89 | 1,462,368 |
| 6/30/90 | 807,267 |
| 6/30/91 | 321,780 |
| | 21,612,766 |

Petitioner allocated its actual costs of manufacturing and delivering copies of LHJ to the acquired subscribers based in

part on a ratio of editorial pages to advertising pages of approximately 45 percent to 55 percent.

Petitioner and FMI did not agree to reduce the purchase price of LHJ by any specific amount to take into account petitioner's assumption of FMI's fulfillment obligation to manufacture and deliver copies of LHJ to subscribers existing as of January 3, 1986, and with respect to whom petitioner had not and would not receive any subscription payments attributable to their existing subscriptions. No portion of the prepaid subscription income received by FMI and deferred under section 455 was transferred or paid over to petitioner, either directly or indirectly. Petitioner did not receive from FMI, either directly or indirectly, any form of compensation from FMI in consideration for its agreement to assume FMI's fulfillment obligation.

In making its decision to purchase LHJ, petitioner analyzed projections of revenues and expenses that could be expected under petitioner's ownership. These projections were set forth in pro forma financial statements and took amortization of the acquired subscriber relationships into account.

OPINION

Each of the three issues to be decided in these cases involves the valuation of an intangible asset acquired as part of the purchase of an ongoing business. Additionally, with respect to the Blyth employment relationship, we must determine its remaining useful life as of January 3, 1986. With respect to the noncompetition agreements, we will also be required to consider the legal standard which petitioner's proof must meet to establish the value of the noncompetition agreements.

The purpose of the aforementioned valuation is to determine petitioner's depreciable basis in each asset. Section 167(g) provides that the basis for the allowance of depreciation shall be the adjusted basis provided in section 1011. Sections 1011 and 1012 generally provide that the adjusted basis of property shall be its cost, adjusted as provided in section 1016. The parties agree that for purposes of this case, the cost of each of the assets in issue is equal to its fair market value.

Where a group of assets constituting a business is acquired and the purchase price paid approximates the fair market value of such assets, it is generally appropriate to apply the "residual method" to determine the basis of the acquired assets. See *Jostens, Inc. v. Commissioner*, 956 F.2d 175, 177 (8th Cir. 1992), affg. T.C. Memo. 1989–656; *R.M. Smith, Inc. v. Commissioner*, 591 F.2d 248, 252–253 (3d Cir. 1979), affg. 69 T.C. 317 (1977); *Philip Morris Inc. v. Commissioner*, 96 T.C. 606, 625 (1991), affd. without published opinion 970 F.2d 897 (2d Cir. 1992); *Banc One Corp. v. Commissioner*, 84 T.C. 476, 502–503 (1985), affd. without published opinion 815 F.2d 75 (6th Cir. 1987). Under the residual method, purchase price is first allocated to assets other than assets in the nature of goodwill. Any excess of purchase price over the fair market value of such assets is deemed to be the value of goodwill. Neither party disputes that the application of the residual method is appropriate here. There is also no question that, by any measure, the purchase price to be allocated exceeds the fair market value of the acquired tangible and amortizable intangible assets.

Petitioner bears the burden of proving the fair market values, and with respect to the Blyth employment relationship, the remaining useful life, of the assets at issue. Rule 142(a). For this purpose, we refer to the definition of fair market value recognized by the Supreme Court in *United States v. Cartwright*, 411 U.S. 546, 551 (1973), wherein the Court stated:

"The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 20.2031–1(b). The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves, * * *

With this standard in mind, we proceed to consideration of each of the issues presented.

Petitioner's acquisition of the assets of LHJ predates the effective date of section 1060 and the regulations thereunder. Tax Reform Act of 1986, Pub. L. 99–514, sec. 641(a), 100 Stat. 2282. We express no opinion regarding the results which would follow were section 1060 applicable to this transaction.

## A. *Blyth Employment Relationship*

Petitioner contends that, as part of the acquisition of the LHJ assets, it acquired an intangible asset in the form of the employment relationship with Blyth. Petitioner asserts that this relationship had a useful life which could be estimated with reasonable accuracy and a determinable value separate and apart from goodwill. See sec. 1.167(a)–3, Income Tax Regs. Petitioner claims that the remaining useful life of the Blyth employment relationship was 13.94 years and that the value of the relationship, as of January 3, 1986, was $25,700,000. Respondent, on the other hand, contends that the Blyth relationship had a remaining useful life of 35 months, i.e., the remaining term of Blyth's employment contract, and that its value, as of January 3, 1986, was $135,000.

Petitioner executed the letter of intent and purchase agreement prior to Blyth's giving the consent required for the assignment of her employment contract to petitioner. Thus, the purchase price for the LHJ assets had been established prior to there being certainty that the Blyth employment relationship would be included in the purchase. Petitioner argues that if Blyth had not consented to the assignment, petitioner would have declined to close the LHJ acquisition pursuant to the "material adverse change" clauses of the letter of intent and purchase agreement. However, FMI had explicitly refused to make the sale of LHJ contingent upon the agreement of any employee. FMI had thereby put petitioner on notice that it did not consider the "material adverse change" clauses to cover Blyth's failure to consent.

In addition, under petitioner's valuation methods, most of the $25,700,000 asserted value would have been lost had Blyth chosen not to continue in petitioner's employment beyond the remaining term of her contract. Nevertheless, petitioner made no attempt to negotiate an extension or option to extend the Blyth employment agreement prior to closing the sale. In fact, petitioner signed the letter of intent prior to Blyth's having been informed of the sale. Petitioner argues that it had a realistic expectation that Blyth would remain at LHJ beyond the term of her contract. However, as of the date of acquisition Blyth and petitioner's management had no experience working together, and any expectations

regarding Blyth's continued employment beyond the term of her contract were purely speculative.

Under these circumstances, it seems unlikely that a reasonable purchaser would risk $25,700,000 on an asset the value of which could so readily be lost. Additionally, while Riordan testified that as president of FMI he considered Blyth to be highly valuable to LHJ, when asked for his reaction to the assertion that the value of the Blyth employment relationship might have been as high as $23,850,000, he responded, "That is crazy." We are convinced that the useful life and value asserted by petitioner for the Blyth employment relationship are unsupported by the record. For the reasons discussed below, the expert reports presented by petitioner also fail to provide a reasonable basis for petitioner's assertions.

### 1. *The ManagementSystems Research Report*

The report primarily relied upon by petitioner was performed by ManagementSystems Research (MSR) under the direction of Eric G. Flamholtz, Ph.D. Flamholtz is president of MSR, which he founded in 1978, and is also a professor of management at the Graduate School of Management at the University of California, Los Angeles. He had formerly served on the faculties at Columbia University and the University of Michigan. Flamholtz has also engaged in extensive management consulting activities. The MSR report determined the useful life of the Blyth employment relationship by identifying "successful" editors-in-chief of Seven Sisters publications and averaging their career lengths. The value of the Blyth employment relationship was based upon an examination of changes in market share of Seven Sisters advertising revenues following the occurrence of certain editor events. The report used this information to predict the difference, over the remaining useful life of Blyth's employment, in advertising revenues which would be expected at LHJ with and without Blyth as editor-in-chief. The present value of the difference in gross advertising margin, plus the value of tax benefits from amortization of the relationship, was determined to be the value of the Blyth employment relationship.

## a. *Determination of Useful Life*

In attempting to identify "successful" editors-in-chief, the MSR report considered all of the Seven Sisters editors-in-chief whose careers overlapped the period 1960 through 1985. In order for one of these editors to be classified as successful, the MSR report stated that the editor-in-chief must satisfy all three of the following criteria:

1. *Tenure.* The editor remains as Editor-in-Chief with a particular magazine for a minimum of four years;

2. *Performance.* There occurs an increase in the magazine's market share during the first four years of 2% or more; additionally, the editor cannot preside over a decline in performance of 2% or more; and

3. *Industry Perception.* There is no evidence that industry perceptions about an editor differ from judgments based on the above criteria (e.g., that an editor was known to have been terminated involuntarily).

The MSR report identified 10 successful editors-in-chief, but in doing so, the report does not appear to have applied its three criteria on a consistent basis. The second criterion appears to require the application of a two-part test: first, that an increase in market share of at least 2 percent occur during the first 4 years of the editor's employment; and second, that the editor not preside over a decline in performance of 2 percent or more. The application of this criterion is confusing because of the fact that information included in the MSR report shows that five of the successful editors identified by MSR did in fact preside over declines of 4 percent to 7 percent in market share during their tenures as editors-in-chief of Seven Sisters publications. The approximate declines in performance were as follows: (1) LHJ's market share declined from approximately 25.5 percent to 16 percent while the Goulds were editors from 1959 to 1962; (2) Good Housekeeping's market share declined from approximately 18.5 percent to 11.5 percent while Nichols was editor from 1967 to 1974; (3) Better Homes and Gardens' market share declined from approximately 20.5 percent to 16 percent while Autry was editor from 1973 to 1975; (4) LHJ's market share declined from approximately 18.5 percent to 14 percent while Carter was editor from 1971 to 1974; and (5) Redbook's market share declined from approximately 11 percent to 7 percent while Chassler was editor from 1975 to 1983.

The 10 editors referred to above were as follows:

| Editor | Magazine | Length | Start date | Finish date |
|--------|----------|--------|-----------|-------------|
| Gould, B. & B. | LHJ | 26.8 | July 1935 | Apr. 1962 |
| Mayes, H. | Good Housekeeping, McCall's | 24.1 | Jan. 1938 | Feb. 1962 |
| Nichols, W. | Redbook, Good Housekeeping | 26.3 | Jan. 1949 | May 1975 |
| Jones, R. | Family Circle | 13.3 | Jan. 1955 | May 1968 |
| Tighe, E. | Woman's Day | 8.4 | Aug. 1957 | Jan. 1966 |
| Carter, J.M. | Good Housekeeping, LHJ, McCall's | 23.9 | Mar. 1962 | Dec. 1985 |
| Chassler, S. | Redbook | 18.1 | Mar. 1965 | Apr. 1983 |
| Rhoads, G. | Woman's Day | 15.7 | Jan. 1966 | Sept. 1981 |
| Hettich, A. | Family Circle | 16.1 | June 1968 | July 1984 |
| Autry, J. | Better Homes | 10.0 | July 1969 | July 1979 |

We note initially that two of these editors began their editor-in-chief careers before Blyth was born. Four of these editors ended their careers approximately 18 to 24 years before the valuation date here in issue. Additionally, as of the valuation date, the earliest careers were of the longest duration.

The MSR report computed the useful life of the Blyth employment relationship by averaging the career lengths of the 10 comparable editors-in-chief. The remaining useful life of the Blyth employment relationship was then calculated by subtracting the period of time Blyth had been employed at LHJ as of the valuation date. As the average career length of the successful editors was 18.27 years and Blyth had been at LHJ for 4.33 years as of the valuation date, the MSR report determined that the remaining useful life of the Blyth employment relationship, as of January 3, 1986, was 13.94 years (18.27 less 4.33). This determination was not adjusted to reflect any possibility that Blyth might chose to leave LHJ prior to the end of her career.

The MSR report states that the average tenure of the 10 successful editors-in-chief at a given publication was 12.5 years. Use of this figure would have resulted in a remaining useful life for the Blyth employment relationship of 8.17 years.

Petitioner asserts that it was proper to assume that Blyth would spend her entire career at LHJ because she was devoted to her job and because, as a result of her success, petitioner would desire to retain her as editor-in-chief for her entire career. Petitioner argues this even though, as of the

valuation date, Blyth and petitioner's management had no experience working with each other. In addition, the MSR report states that

In our research to develop the editor database, we found a significant amount of movement among Seven Sisters magazines both at the level of Editor-in-Chief and among more junior level editors—with some achieving promotion to Editor-in-Chief by moving to another publication, as Myrna Blyth did in moving from Family Circle to LHJ.

We are unwilling to accept the MSR report's conclusions as to the useful life of the Blyth employment relationship because, among other things: (1) The report failed to give adequate consideration to the impact of new management upon the likelihood of Blyth's staying with LHJ even though it found that editors-in-chief regularly moved among Seven Sisters publications; (2) the report was inconsistent in its use of the criteria set out for identifying successful editors-in-chief; and (3) the report relied on data from careers which, in 4 out of 10 cases, ended at least 18 years before the valuation date.

b. *Determination of Revenue Differential*

The MSR report determined the value of the Blyth employment relationship by estimating the present value of the advertising profits attributable to Blyth. This estimate was based primarily on the loss of advertising market share at two of the Seven Sisters following the departure of a successful editor for an editor-in-chief position at another of the Seven Sisters publications (an "exit and compete" event). The determination was supported by an analysis of increases in advertising market share at several of the Seven Sisters following the commencement of employment of a successful editor (an "arrival" event). The change in advertising revenues was computed by determining a market share baseline and then measuring the percentage change in market share during the years following the event. The baseline was the average of the advertising market share during the 3 years preceding the event.

The two exit and compete events considered in the MSR report were the departure of John Mack Carter from McCall's in March 1965 for the editor-in-chief position at LHJ in April 1965, and his departure from LHJ in February 1974

and arrival at Good Housekeeping in June 1975. With respect to the first of these events (Carter's move from McCall's to LHJ), McCall's market share dropped off sharply after Carter's departure, but its market share was wavering prior to his departure and was less in the year of his departure than in the year he began at McCall's. Similarly, while LHJ's market share initially increased during Carter's tenure, it was lower in the year of his departure than in the year of his arrival. LHJ's market share increased from approximately 15 percent in the year of Carter's arrival (1965) to approximately 18.5 percent in 1971, but dropped to approximately 14 percent in the year of his departure (1974).

In fact, the rate of decrease in LHJ's market share in the years following Carter's departure was less than the rate of decrease during the 3 years immediately preceding his departure. We believe these facts call into question whether the changes in market share at the time of the exit and compete events were in fact the result of such events. With respect to the second exit and compete event, it is absolutely clear that the decrease in LHJ's market share was a trend which began 3 years prior to Carter's departure.

The arrival events considered in the MSR report consisted of five: Chassler's arrival at Redbook in March 1965; Carter's arrival at LHJ in April 1965; Rhoads' arrival at Woman's Day in February 1966; Hettich's arrival at Family Circle in June 1968; and Carter's arrival at Good Housekeeping in June 1975. However, six editor arrivals actually occurred during the period 1960 to 1985 among the 10 "successful" editors identified by the MSR report. In July 1969, Autry began his 10-year career as editor-in-chief of Better Homes and Gardens. Without explanation, the MSR report failed to include this arrival event in its analysis. In fact, the MSR report presents a graphic representation of the changes in market share following the five arrival events and states that "Exhibit 4 presents *all* of the successful editor arrivals that occurred during the period." (Emphasis added.) We note that while Better Homes and Gardens' market share increased during Autry's first 4 years, those gains were lost during the next 2 years and never recovered during Autry's tenure. Thus, the inclusion of Autry's arrival event would have decreased the average revenue gains which followed arrival events.

## c. *Likelihood of Successful Replacement*

The MSR report adjusted the estimated revenue losses resulting from the exit and compete events for the possibility of finding a successful replacement editor. The report states that "a successful replacement editor was found quickly in only about 33 percent of the turnover Events." The report concludes, however, that this overstates the likelihood of quickly finding a successful replacement editor should Blyth quit because retirement situations were included in the turnover events and in retirement situations the retiring editor is likely to have groomed a replacement. Because a replacement editor was not being groomed at LHJ, the MSR report estimated that the likelihood of quickly finding a successful replacement for Blyth was only 20.83 percent. The MSR report therefore decreased the estimate of market share lost upon the exit and compete events by 20.83 percent. This figure appears to have been based upon an analysis of all the editors-in-chief of Seven Sisters publications during the period 1960 through 1985, rather than being limited to replacement of successful editors-in-chief.

This analysis assumes that if a successful replacement editor is not found quickly, one will not be found for the duration of the useful life of the Blyth employment relationship. This assumption, and the general replacement analysis contained in the report, is not supported by the actual results which occurred upon replacement of successful editors-in-chief during the period 1960 through 1985.

In all, 11 successful editors were replaced at the Seven Sisters during the period 1960 through 1985. Two of these replacements had not been in place long enough as of the end of 1985 to be classified as successful editors under criterion 1. The nine remaining successful editor replacement events resulted in: (a) Five replacements by other successful editors within 3 years, (b) two replacements by editors not classified as successful but without significant loss in market share, (c) one replacement in which the new editor decreased the rate of market share loss, and (d) one replacement which was followed by a sudden and continued downturn in market share. Additionally, five of the first eight replacement editors referred to above were hired away from other magazines.

Not only are these facts inconsistent with those assumed in the MSR report in adjusting the exit and compete event figures, but we believe that these facts completely undermine the valuation analysis contained in the MSR report. If Blyth can be readily replaced with another successful editor-in-chief, or otherwise be replaced without significant loss of market share, little value, separate and apart from increases in the value of goodwill, can be attached to the Blyth employment relationship. The facts contained in the MSR report suggest that such replacement is possible.

### d. *Cost of Retention*

While the MSR report valued the Blyth employment relationship at $25,700,000 primarily based upon the value which would be lost if she departed, the report made no adjustment to account for the amounts which petitioner would have to pay Blyth to retain her services for the 11 years it assumed she would remain with LHJ after the expiration of her employment contract. The testimony of Burnett, petitioner's president and chief executive officer, made it clear that petitioner anticipated needing to pay Blyth "a lot more money" after the expiration of her contract. The failure of the MSR report to estimate the increased cost which would be borne by petitioner to maintain the Blyth employment relationship is clearly an additional fault in its analysis.

### 2. *Veronis, Suhler Report*

The report offered by petitioner as further support for the conclusions contained in the MSR report was produced by Veronis, Suhler & Associates (VSA) primarily under the direction of John Suhler. VSA was founded in 1981 by John Veronis and John Suhler to provide investment banking expertise to the communications industry. Suhler is president and co-chief executive of VSA. Suhler was previously president of the CBS Publishing Group, which owned such major magazine titles as Woman's Day, Field & Stream, Road & Track, and American Photographer. The VSA report used two methods to value the Blyth employment relationship.

a. *Transaction Multiple Analysis*

In this portion of its report, VSA analyzed sales of consumer magazines during the years 1983 through 1985 "to determine whether a relationship exists between prices paid for magazine properties with uniquely successful or 'star' editors compared to those which did not have such an editor." The report identified nine sales of consumer magazines during this period.

With respect to dividing the nine sales between those which included a "star" editor and those which did not, the report states only that

VS&A has evaluated the editor, or editor-in-chief, of each magazine at the time of [sic] transaction. The evaluation was based on subjective criteria, mostly on whether or not the editor in charge was deemed a "star", or a sought after editor at the time of the transaction.

Without additional explanation, the report determined that three of the sales included star editors and six did not include star editors. With respect to each of these sales, the VSA report calculated a price to revenues ratio (P/R ratio) and a price to pretax earnings ratio (P/E ratio).

The three star editor transactions identified by the VSA report, and their P/R and P/E ratios, were as follows:

| Magazine | Sale date | P/R ratio | P/E ratio |
|---|---|---|---|
| The Mother Earth News | Dec. 1985 | 0.45 | 4.78 |
| Gourmet | Sept. 1983 | 1.26 | 15.79 |
| New Yorker | May 1985 | 2.06 | 16.24 |
| Average ratios | | 1.25 | 12.27 |

The six nonstar editor transactions identified by the VSA report, and their P/R and P/E ratios, were as follows:

| Magazine | Sale date | P/R ratio | P/E ratio |
|---|---|---|---|
| Houston H&G | Aug. 1984 | 0.83 | 7.33 |
| Psychology Today | Feb. 1983 | 0.20 | 1.25 |
| New Woman | June 1984 | 1.29 | 14.06 |
| Art in America | Dec. 1984 | 1.18 | 9.46 |
| U.S. News & World Report | July 1984 | 0.79 | NC |
| Financial World | June 1983 | 1.67 | 7.70 |
| Average ratios | | 0.99 | 7.96 |

As shown above, the average P/R ratio of the star editor transactions was 30 percent higher than the P/R ratio for the nonstar transactions and the average P/E ratio of the star transactions was 50 percent higher than the P/E ratio for the nonstar transactions. The VSA report therefore concluded that petitioner's purchase price for LHJ included a 30-percent to 50-percent premium as a result of Blyth's being the editor-in-chief. As the stated consideration paid for the LHJ assets was $92 million, the VSA report valued the Blyth employment relationship at between $21 million and $31 million.

Initially, we question the credibility of this analysis because the report fails to explain the basis for the division of the nine transactions between those including a star editor and those not including a star editor. Even ignoring this problem, however, we find the report's analysis to be completely without merit.

While the spread between the average star and nonstar P/R ratios was determined to be 30 percent, the spread between the lowest and highest star transaction P/R ratios was 360 percent and for the nonstar transactions was 730 percent. Similarly, while the spread between the average star and nonstar P/E ratios was determined to be 50 percent, the spread between the lowest and highest star transaction P/E ratios was 240 percent and for the nonstar transactions was 1,020 percent. Additionally, if the nine transactions were ranked from highest to lowest P/R ratios, the three star transactions would be ranked first, fourth and eighth, a seemingly random distribution. We find that these figures completely fail to establish that "a relationship exists between prices paid for magazine properties with uniquely successful or 'star' editors compared to those which did not have such an editor." These ratios establish no pattern whatsoever.

Even if the foregoing analysis were found to have some merit, it nevertheless fails to separate out any value which might have been created by the star editor but which would remain with the publication upon the star editor's departure. As we have previously noted, any value which is not lost upon the departure of the editor does not have a useful life which is coextensive with the editor's employment relationship, and such value cannot, therefore, be amortized over the useful life of the employment relationship.

b. *Net Present Value Calculation of "Business as Usual" vs. "Disruption of Business" Scenarios*

In this portion of its report, VSA attempted to calculate the value of the advertising profits which would be lost if Blyth were not present as editor-in-chief of LHJ. The VSA report noted that in 1982, LHJ's share of the Seven Sisters advertising market was 7.8 percent and that in 1985 it had risen to 10.5 percent. VSA therefore assumed that LHJ's share of the Seven Sisters advertising market would be 7.8 percent without Blyth and 10.5 percent with Blyth throughout the remaining useful life of the Blyth employment relationship (as determined by the MSR report). Based on these assumptions, VSA determined that the present value of lost profits would total $21,600,000.

The VSA report assumed that the Seven Sisters advertising market would grow at a compounded annual rate of 6.3 percent from 1986 through 1990, and at a rate of 4 percent from 1991 through 1999. The report also assumed that LHJ's pretax operating profits would equal 30 percent of net advertising revenues. The discount rate used was the 14-percent rate computed by Price Waterhouse in the valuation of the subscriber lists, discussed below.

The foregoing analysis is based upon the 14-year remaining useful life computed for the Blyth employment relationship by the MSR report. As we have determined that the computation of useful life in the MSR report was unconvincing, the computation of the value of lost advertising profits contained in the VSA report fails, also. However, this analysis would fail even if we accepted the useful life used for the Blyth employment relationship.

With regard to its market share assumptions, the VSA report states as follows:

Had * * * [Blyth] left *Ladies' Home Journal* at the end of 1985, it is probable that all the market share gains attained in the prior three years would have been lost to the competition. If *Ladies' Home Journal's* operations had been so disrupted, it could have expected to see its gross advertising market share decline to the 1982 level of 7.8 percent, or even lower.

In 1981, Blyth became editor-in-chief of LHJ. In 1982, FMI purchased LHJ from Charter publishing for $12 million. FMI's business strategy was to acquire publications which it consid-

ered to be "underperforming" and to improve them. During the period FMI owned LHJ it implemented numerous programs which helped in making LHJ more profitable. These programs included strategies aimed at increasing advertising sales.

In spite of these facts, the VSA report has attributed 100 percent of the 1982 to 1985 increase in LHJ's market share of Seven Sisters advertising to Blyth. There is no question that Blyth was a highly effective editor-in-chief and that some of LHJ's improvement is attributable to her skills. However, there is also no question that FMI and Riordan were highly skilled in the management of consumer magazines and that some portion of the 1982 to 1985 increase in LHJ's market share is attributable to them.

We note that petitioner's brief states that

Under Riordan's ownership, *LHJ* had been brought back from near extinction in 1982 to the point, in 1985, where it was once again a seemingly healthy publication with an apparently strong circulation. * * * The magazine industry believed that Riordan's circulation abilities had contributed to *LHJ*'s then recent success.

The expert report offered by petitioner with respect to the noncompetition agreements states as follows:

As Director of Circulation, Riordan was more responsible for the overall business results of the magazine than either of the magazine's other top positions in advertising or editorial.

Additionally, we believe it likely that some of the increase in market share resulting from changes made by Blyth might not be lost upon Blyth's departure and that an increase in value resulting from such changes is more properly considered an increase in the goodwill/going-concern-value of LHJ. See *supra* p. 434.

### 3. *Conclusion*

As was recently stated by the Supreme Court in discussing the amortization of intangibles, the taxpayer's burden of proof is not insignificant and "that burden often will prove too great to bear." *Newark Morning Ledger Co. v. United States*, 507 U.S. ___, ___, 113 S. Ct. 1670, 1681 (1993). Based upon the facts surrounding the 1986 acquisition of the LHJ assets, we consider petitioner's claims with respect to the

useful life and value of the Blyth employment relationship to be speculative at best. The expert reports and testimony offered by petitioner neither adequately support these claims nor provide a basis upon which to make a reasonable estimate of the useful life or value of the Blyth employment relationship. Respondent's determination has a presumption of correctness, *Welch v. Helvering*, 290 U.S. 111, 115 (1933), and the record in this case does not provide a basis for setting aside this presumption. Respondent has conceded that as of January 3, 1986, the remaining useful life of the Blyth employment relationship was 35 months and its value was $135,000. We have been shown no basis for going beyond that concession, and we so hold.

## B. *The Noncompetition Agreements*

Petitioner contends that the noncompetition agreements executed in conjunction with the purchase of the LHJ assets had a value of $4,600,000, as of January 3, 1986, and that such value is amortizable over the term of the agreements; i.e., 5 years. Respondent, on the other hand, contends that petitioner is not entitled to amortize amounts in excess of the amounts specified in the "Consideration" clauses of the two agreements.

The FMI noncompetition agreement states that petitioner "is making a payment * * * in an amount equal to $10,000" in consideration of the agreement. The Riordan noncompetition agreement also states that, in consideration therefor, petitioner is making "direct payments to Riordan pursuant to a consulting agreement" and indirect payments in the amount of $10,000 which Riordan is to receive pursuant to the liquidation of FMI. It seems somewhat unusual that the consideration paid pursuant to the consulting agreement is incorporated within the consideration clause of the Riordan noncompetition agreement. However, the only consulting done by Riordan pursuant to the consulting agreement consisted of one meeting with petitioner's circulation personnel. This fact seems consistent with the view that the $100,000 paid to Riordan pursuant to the consulting agreement was, at least in part, consideration for his execution of the noncompetition agreement. Consequently, we consider the totality of these provisions to be an unambiguous declaration of the total consideration paid by petitioner for the

noncompetition and consulting agreements. This necessarily leads us to consider the standard of proof which petitioner must satisfy in order to establish that it is entitled to claim an amortizable basis substantially in excess of the amounts stated in the agreements.

(We note parenthetically that paragraph 1.2 of the purchase agreement specifies the "assets, properties, rights, and claims" which were acquired in exchange for the consideration paid by petitioner pursuant to such agreement. While the purchase agreement was contingent upon the execution of the noncompetition agreements and the consulting agreement, the noncompetition agreements and the consulting agreement are not specified as being assets, properties, rights, or claims acquired in exchange for the consideration paid pursuant to the purchase agreement. This would generally be construed as an allocation of all of the purchase price to the listed assets and none to the noncompetition and consulting agreements. See *Major v. Commissioner*, 76 T.C. 239, 247 (1981); *G C Services Corp. v. Commissioner*, 73 T.C. 406, 411 (1979).)

Where a taxpayer asserts that an allocation of consideration is other than that specified in a contract, this Court has generally taken the position that the taxpayer must present "strong proof" that the asserted allocation "is correct based on the intent of the parties and the economic realities." *Major v. Commissioner, supra* at 247. A number of U.S. Courts of Appeals have adopted this rule. See *Sonnleitner v. Commissioner*, 598 F.2d 464 (5th Cir. 1979), affg. T.C. Memo. 1976–249; *Harvey Radio Laboratories, Inc. v. Commissioner*, 470 F.2d 118 (1st Cir. 1972), affg. T.C. Memo. 1972–85; *Estate of Rogers v. Commissioner*, 445 F.2d 1020 (2d Cir. 1971), affg. T.C. Memo. 1970–192; *Schulz v. Commissioner*, 294 F.2d 52 (9th Cir. 1961), affg. 34 T.C. 235 (1960). However, the Court of Appeals for the Third Circuit has held that a taxpayer may only challenge the substance of unambiguous contractual provisions

by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [*Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965).]

In addition, the parol evidence rule barring the admission of extrinsic evidence may apply where a taxpayer asserts a position contrary to an unambiguous contractual provision. See *Estate of Craft v. Commissioner*, 68 T.C. 249, 260–263 (1977), affd. 608 F.2d 240 (5th Cir. 1979).

Both parties agree that our determination in these cases is controlled by decisions of the Court of Appeals for the Eighth Circuit. *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Both parties also recognize that the Court of Appeals has never specifically adopted or rejected the *Danielson* rule. Petitioner argues that the rule of the Eighth Circuit with respect to the introduction of parol evidence in tax cases is consistent with our holding in *Estate of Craft v. Commissioner, supra* at 260–263, that the parol evidence rule does not bar the admission of extrinsic evidence in cases involving a "third-party to the instrument" unless the issue is one of State law rights. Petitioner concludes, as a result, that where the issue is the allocation of consideration rather than the interpretation of State law rights, the parol evidence rule barring extrinsic evidence is inapplicable. Respondent, on the other hand, argues that the decisions of the Court of Appeals for the Eighth Circuit regarding the application of the parol evidence rule in tax cases are consistent with the *Danielson* rule.

In a memorandum opinion, this Court has previously considered the rule of the Eighth Circuit regarding the introduction of parol evidence in tax cases. See *Molasky v. Commissioner*, T.C. Memo. 1988–173, affd. in part, revd. in part and remanded 897 F.2d 334 (8th Cir. 1990). The contract at issue in *Molasky* allocated consideration between goodwill and covenants not to compete.

The taxpayer in *Molasky* argued for a greater allocation to goodwill and less to the covenants. We concluded that the Court of Appeals for the Eighth Circuit would allow the Government to assert the parol evidence rule to bar the introduction of extrinsic evidence contrary to the unambiguous terms of the contract. However, upon appeal, the Court of Appeals noted that its prior holdings with respect to the application of the parol evidence rule in tax cases had "not been entirely consistent." *Molasky v. Commissioner*, 897 F.2d 334, 337 (8th Cir. 1990); see *Sullivan v. United States*, 363 F.2d 724 (8th Cir. 1966) (parol evidence not admitted with

respect to corporate shareholder's obligation to buy stock of second shareholder); *Reynolds v. Boos*, 188 F.2d 322 (8th Cir. 1951) (parol evidence admitted to show period in which debt for back rent was forgiven); *Birmingham v. Bartels*, 157 F.2d 295 (8th Cir. 1946) (parol evidence admitted by both Supreme Court and Court of Appeals for the Eighth Circuit with respect to whether contract accurately identified employer of musicians), revd. 332 U.S. 126 (1947).

Petitioner suggests that the above cases are all consistent with the analysis of the parol evidence rule set out by this Court in *Estate of Craft v. Commissioner, supra* at 260–263. In *Estate of Craft* we held that

in those instances where we are called upon to make a State law determination as to the existence and extent of legal rights and interests created by a written instrument, we must look to that State's parol evidence rule in deciding whether or not to exclude extrinsic evidence that bears on the disputed rights and interests under the instrument.

\* \* \* \* \* \* \*

Our holding herein, however, should not be construed as a total rejection of the "third-party to the instrument rule" as applied in those numerous cases cited *supra*. The vast majority of such cases did not involve a determination of legal rights or property interests under State law but rather concerned the proper allocation (or character) of amounts paid under a contract. \* \* \*

[68 T.C. at 263; citations omitted.]

The Court of Appeals for the Eighth Circuit did not, however, adopt such an approach in *Molasky*.

The Court of Appeals in *Molasky* affirmed our refusal to reallocate amounts between goodwill and the covenants by citing facts which supported such refusal, but without clarifying its position on the parol evidence rule. Since the position of the Court of Appeals for the Eighth Circuit remains unclear, we will continue to adhere to the strong proof rule in these cases. We therefore consider whether the evidence offered in these cases constitutes strong proof of petitioner's asserted allocations. As previously stated, this proof must establish that the asserted allocation "is correct based on the intent of the parties and the economic realities." *Major v. Commissioner*, 76 T.C. at 247.

We find it difficult to accept that petitioner intended that an amount as large as $4.6 million be allocated to the noncompetition agreements at the time such agreements

were executed, while at the same time allowing a completely contrary consideration clause to be included in those agreements. See *id.* at 250. Because the record contains no evidence that the $4.6 million figure had been considered by any party to the negotiations in 1985, petitioner now asserts that its intended allocation at the time was $10 million, the amount of the cap on damages included in the noncompetition agreements. But *each* of the noncompetition agreements contains a separate $10 million cap on damages, so that, were petitioner's logic to be accepted, a total allocation of $20 million could plausibly be argued.

The term, scope, and damages provisions of the noncompetition agreements were negotiated in detail, and the "Consideration" clause of the Riordan noncompetition agreement, to which petitioner attributes most of the allocation, is not a mere standard recital of consideration received. As previously stated, this consideration clause incorporates a reference to the consideration paid pursuant to the consulting agreement and to an amount to be received upon the planned liquidation of FMI. Such language was clearly not boilerplate contractual language included without careful reflection upon its meaning. And tellingly, the LHJ opening balance sheet, as of January 3, 1986, prepared by petitioner, listed the Riordan noncompetition agreement as an asset in the amount of $10,000.

Petitioner forcefully argues that its intent to allocate a greater amount than stated to the noncompetition agreements is shown by the importance it placed upon such agreements at the time of the purchase of LHJ and by the value of such agreements as established by its expert witness report. Beyond attempting to establish that the noncompetition agreements were valuable, however, petitioner has not attempted to establish that FMI and Riordan intended such allocations. While we accept that petitioner considered the noncompetition agreements to be important at the time of the acquisition, we do not believe that this fact alone establishes the sizable allocation asserted by petitioner. This is particularly so in the face of the specific contractual provisions to the contrary. Furthermore, petitioner's expert's testimony with respect to the value of the noncompetition agreements is neither relevant nor convincing. For complete-

ness, however, and because petitioner attaches so much weight to it, we will discuss the testimony.

Petitioner's expert, Roger J. Grabowski, is a partner and national director of Price Waterhouse Valuation Services, located in Chicago. He has had extensive experience in directing valuation studies of numerous types of business interests and assets, including customer lists. Grabowski estimated the fair market value of the noncompetition agreements, as of January 3, 1986, to be $4,600,000 by estimating (1) the likelihood of competition by Riordan absent the noncompetition agreements, and (2) the increased costs which LHJ would incur in countering such competition.

With respect to the likelihood of competition by Riordan, Grabowski's report states that

> Competition would be feasible given market conditions only if Riordan were able to purchase a Seven Sisters magazine. Starting a new "eighth sister," rather than purchasing an existing Seven Sister [sic] magazine is generally considered to be prohibitively expensive.

The report estimated the likelihood of Riordan's reentering the Seven Sisters market based on "discussions [sic] Meredith management and others familiar with Riordan and his business tendencies." The report concluded that, absent a noncompetition agreement, the likelihood of Riordan's beginning competition in each of the 5 years following the acquisition was as follows: 80 percent in the first year, 14 percent in the second year, 3 percent in the third year, 0.9 percent in the fourth year, and 0.2 percent in the last year. These figures are based upon Grabowski's conclusion that the probability of Riordan's acquiring a Seven Sisters magazine was 80 percent in 1986 and, if he had not acquired one in a prior year, 70 percent in 1987, 50 percent in 1988, 30 percent in 1989, and 10 percent in 1990. The resulting 1987 figure of 14 percent, for example, was therefore computed by multiplying the 20-percent likelihood that Riordan had not acquired a Seven Sisters magazine in 1986 times the 70-percent likelihood of his acquiring one in 1987. Consequently, the report concluded that had the noncompetition agreements not been executed, there was only a 1.9-percent likelihood of Riordan's not acquiring a Seven Sisters publication during the years 1986 through 1990.

As of the end of 1985, Riordan's immediate intentions were to retire to Florida and be an absentee owner of the magazines he owned at that time. This intention had been communicated to petitioner. Additionally, while Riordan had not ruled out the possibility of purchasing magazine properties in the future, and while it was reasonable for petitioner to have expected that one or more of the other Seven Sisters might become available for purchase prior to 1991, there is no indication in the record that Riordan would be the only interested purchaser, or even the most likely purchaser, of a Seven Sisters magazine during the years 1986 through 1991.

As of the end of 1985, Riordan had been an owner of, or worked for the owners of, the following magazines: Esquire, GQ, Coronet, Vogue, House and Garden, Glamour, Mademoiselle, Bride's, Newsweek, Golf Illustrated, Savvy, 1001 Home Ideas, Health, The Homeowner, and World Tennis. Riordan had worked for Newsweek for a total of 12 years. On the other hand, Riordan's only experience in the Seven Sisters market consisted of the 4 years FMI owned LHJ. While Riordan had remarkable success with the purchase and sale of LHJ, his career history strongly suggests that had he put aside his retirement plans and acquired a magazine, it was at least as likely as not that the acquired magazine would not have been a Seven Sisters magazine.

Based on these facts, we consider the proposition that there was a 98.1-percent likelihood of Riordan's acquiring a Seven Sisters magazine during the period 1986 through 1990 to be totally unrealistic. The record in this case strongly suggests that at best the likelihood of Riordan's acquiring a Seven Sisters magazine during the 5 years covered by the noncompetition agreements was a mere fraction of this number. Because Grabowski's analysis multiplies the likelihood of competition by the estimate of increased expenses resulting from competition, this extreme overstatement of the likelihood of competition results in an extreme overstatement of the value of the noncompetition agreements.

With respect to the increased expenses which would be incurred by petitioner were Riordan to compete with LHJ, Grabowski's report states that

Meredith management estimates that competition from Riordan would cause LHJ to lose 100,000 subscribers in each year Riordan competes. To

regain the 100,000 lost subscribers, LHJ would be forced [sic] increase its direct mail advertising to honor circulation commitments to advertisers.

The report estimates that to replace 100,000 lost subscribers per year would require that petitioner increase its direct mail solicitation expenses by 5.5 percent. Grabowski used this 5.5-percent figure to estimate petitioner's increased costs from competition by Riordan in 1986 and 1987, and used a 4.5-percent figure for the years 1988, 1989, and 1990.

We accept that, for a period soon after the acquisition of LHJ, competition by a Seven Sisters magazine operated by Riordan might be significantly different in nature from competition by any other of the Seven Sisters. However, the record indicates that nearly 70 percent of LHJ's subscriber base would be replaced during 1986 and in each year thereafter. As we have found, LHJ estimated that on average it would be required to find approximately 2,580,000 new subscribers per year in order to maintain its subscriber base. Its total subscriber base as of the date of acquisition was 3,752,655.

Additionally, as a result of the FTC investigation in 1985, the direct mail solicitation techniques used by LHJ in 1986 were substantially different from those used in 1985. Petitioner was aware of the FTC investigation prior to the acquisition of LHJ. For these reasons, we believe that the information which Riordan possessed regarding LHJ's subscriber base would be of steeply diminishing value in the years following the acquisition. (The report bases its value for the noncompetition agreements solely on increased subscription solicitation costs which would be incurred by LHJ. Thus, Riordan's knowledge of matters related to LHJ other than subscriber list and subscriber solicitation information appears to be irrelevant to the report's analysis.) We do not believe that this is accurately reflected in Grabowski's analysis.

As petitioner has failed to adduce strong proof that its asserted allocation of consideration to the noncompetition agreements is consistent with the intent of the parties and economic reality, we hold that petitioner is not entitled to an amortizable basis in the noncompetition agreements in excess of the amounts recited in the consideration clauses of such agreements.

C. *Subscriber Relationships*

Based upon the recent opinion of the Supreme Court in *Newark Morning Ledger Co. v. United States*, 507 U.S. ____, 113 S. Ct. 1670 (1993), respondent has conceded for purposes of this case that the subscriber relationships acquired by petitioner are, collectively, an amortizable intangible asset. Further, the parties have stipulated that the acquired subscriber relationships had an estimated weighted average remaining useful life of 42 months and that the amount allocable to the cost of acquiring the relationships, if any, may be written off on a straight-line basis over such period.

With respect to the allocation of petitioner's purchase price to the subscriber relationships, the parties have stipulated that, as of January 3, 1986: (1) LHJ had 3,752,655 subscribers who were entitled to a February 1986 issue; (2) these subscribers consisted of 2,271,839 first-time subscribers and 1,480,816 renewed subscribers; and (3) 5,217,347 new or first-time subscribers would be necessary to generate sales of the same number of initial term and renewal subscription copies of LHJ as the 3,752,655 existing subscribers acquired by petitioner.

The parties have each offered reports and testimony of expert witnesses to support their allocations of purchase price to the subscriber relationships. Petitioner's expert, Grabowski, estimated the fair market value of the subscriber relationships, as of January 3, 1986, to be $37,800,000 using an income approach and $46,300,000 using a "cost-avoided" approach.

Grabowski's report describes a multistep method for applying the income approach. The annual after-tax cash-flows which the asset will generate over its remaining useful life and the residual value, if any, of the asset at the end of its remaining useful life are projected. The annual cash-flows and residual value are then discounted to present value. The discounting process uses a rate of return which accounts for the relative risk of not realizing the cash-flow and for the time value of money. Finally, the present values of the annual after-tax cash-flows and of the residual value are added together to determine the fair market value of the asset.

Grabowski's report does not give a description of the general application of the "cost-avoided" approach. The report states that it assumes "that the willing buyer acquired the LHJ tradename (for the $18 million purchase price Meredith paid FMI) on January 3, 1986 and began soliciting new subscribers." The report states that it begins with the total replacement cost determined using the traditional cost approach, but then makes adjustments for "certain economic benefits and costs, which occur during the replacement period".

Based upon his conclusion that a willing buyer would be most likely to rely upon the income approach in valuing the subscriber relationships, Grabowski concluded that $37,800,000 was the best estimate of the value of the subscriber relationships. Respondent's expert, Martin D. Hanan, is president of Business Valuation Services, Inc., an organization he founded in 1987. He was formerly president of H.D. Vest Financial Services and directed regional financial valuation activities of Touche Ross & Co. Hanan has had extensive valuation experience involving a wide variety of assets and business interests. Hanan estimated that the subscriber relationships, as of January 3, 1986, had no value to petitioner. Hanan relied solely on a cost approach to value the subscriber relationships. Both petitioner's expert, Grabowski, and respondent's expert, Hanan, state in their reports that the cost approach is based upon the assumption that a prudent investor would pay no more for an asset than the cost to replace or recreate the asset. Under this approach, the replacement cost "new" is estimated and is then adjusted for any physical deterioration, functional obsolescence, or economic obsolescence.

### 1. Cost Approaches to Valuation

Before discussing the details of the expert reports and the arguments made to support and oppose the experts' conclusions, consideration of a relevant part of the Supreme Court's decision in *Newark Morning Ledger Co. v. United States,* *supra,* may be helpful. At issue in *Newark Morning Ledger* was the value of newspaper subscriber relationships acquired by the taxpayer. The taxpayer had valued the subscriber relationships using an income approach. The Government took the position that the value of the subscriber relation-

ships was no more than the cost of generating a similar list of new subscribers. 507 U.S. at ____, 113 S. Ct. at 1682. Because of its view that the taxpayer had used the wrong approach to valuation, the Government did not offer any evidence to challenge the accuracy of the taxpayer's approach. *Id.* In considering these alternative approaches to valuing the subscriber relationships, the Court stated that

The uncontroverted evidence presented at trial revealed that the "paid subscribers" had substantial value over and above that of a mere list of customers. * * * These subscribers were "seasoned"; they had subscribed to the paper for lengthy periods of time and represented a reliable and measurable source of revenue. In contrast to new subscribers, who have no subscription history and who might not last beyond the expiration of some promotional incentive, the "paid subscribers" at issue here provided a regular and predictable source of income over an estimable period of time. *The cost of generating a list of new subscribers is irrelevant, for it represents the value of an entirely different asset.* * * * [*Id.*; emphasis added.]

On this basis, the Court held that the trial court was justified in relying on the taxpayer's income approach to value the subscriber relationships and that reliance on the Government's cost approach would have been inappropriate.

Respondent argues that the holding of the Supreme Court in *Newark Morning Ledger* is not inconsistent with the application of the cost approach to valuation of the LHJ subscriber relationships because the parties have stipulated that 5,217,347 new or first time subscribers would generate sales of the same number of initial term and renewal subscription copies of LHJ as the 3,752,655 subscribers acquired by petitioner. We agree that this stipulation suggests that a prudent buyer would pay the same amount for 5,217,347 new or first-time subscribers as it would for the 3,752,655 subscribers acquired by petitioner, adjusted for the fact that some of the issues delivered to the 3,752,655 subscribers would generate no subscription revenues because such revenues were retained by FMI. The fact of this equivalence, however, is not alone sufficient to establish that either of the cost approach valuations submitted by the parties accurately values an asset which is comparable to the subscriber relationships acquired by petitioner.

In the cost and "cost-avoided" approach valuations, the experts analyzed LHJ's actual costs incurred in obtaining new subscriptions during the years preceding petitioner's acquisi-

tion of LHJ. The record shows that, on average, LHJ was required to obtain up to 215,000 new subscribers per month in order to prevent its subscriber base from decreasing. The average cost incurred by LHJ in obtaining a new subscriber was estimated by Grabowski and Hanan to be approximately $14.47 and $14.53, respectively. The $14.47 figure is the sum of the direct expenses estimated by Grabowski to relate to a new subscriber; i.e., $14.37, and the "base year" allocable circulation department overhead of $255,000 divided by the base year number of new subscribers; i.e., 2,580,000.

Grabowski's cost-avoided approach determined that 5,217,347 new subscribers could be obtained ratably over 2 years; i.e., at a rate of 215,000 per month. A 4-percent inflation factor was applied to the costs of obtaining new subscribers, and an 11.36-percent discount rate was used to determine the present value of such costs. The costs incurred were decreased by profits generated from new subscribers and increased by advertising profits lost as a result of the time required to generate the new subscriber base (with subscription and advertising revenue being adjusted for a capital charge). Grabowski viewed the resulting net amount, subject to certain tax adjustments, to be the value of the acquired subscribers under the cost-avoided approach. Grabowski did not adjust the value determined under his cost-avoided approach to reflect the fact that petitioner would not receive subscription revenues with respect to the current subscription terms of the acquired subscribers.

Hanan determined that the "replacement cost new" of LHJ's 3,752,655 subscribers would be $14.53 per subscriber and that no adjustments relating to the time required to obtain these subscribers was appropriate. In addition, Hanan concluded in his report that the subscribers obtained by petitioner were worth only 90 percent of the value of the same number of new subscribers. (Hanan's report predates the stipulation of the parties that 5,217,347 new subscribers would generate sales of the same number of copies of LHJ as generated by the 3,752,655 subscribers acquired by petitioner. A supplemental exhibit was placed in evidence which sets forth the conclusions resulting from Hanan's analysis using the stipulated figures.) Hanan therefore assigned an initial value to the 3,752,655 subscribers acquired by petitioner of $49,073,469 (i.e., $14.53 × 3,752,655 × 90 percent).

Hanan then decreased this figure by approximately 51 percent to account for tax benefits which he believed would be generated by the cost of the new subscribers.

Hanan, however, concluded that the figure resulting from the above analysis represented the maximum amount a buyer would pay for subscribers with the full benefit of unearned subscription revenues included in the purchase. Because FMI retained the subscription proceeds with respect to the subscribers acquired by petitioner, Hanan determined that the replacement cost value of the subscribers should be decreased by the amount of unearned subscriptions, as shown in the Grant Thornton financial statement as of December 31, 1985, including deferred agents' commissions and deferred subscription promotion costs. Because the amount of this decrease ($67,273,755) was greater than even the pretax replacement cost of the subscribers, Hanan determined that the subscribers acquired by petitioner had negative value as of January 3, 1986. The supplemental exhibit which set forth the results of Hanan's analysis using the stipulated figures also concluded that the acquired subscriber relationships had a negative value.

Hanan's report states that the rationale for its cost approach valuation is as follows:

The fair market value of the subscriber relationships as of the valuation date is defined as the value to Meredith of LHJ with and without relationships with the existing subscribers, *assuming those relationships could be recreated or replaced in a normal fashion in a short time.* * * * [Emphasis added.]

The evidence contained in the record calls into question whether there is any possible way of replacing all of LHJ's subscribers "in a normal fashion in a short time." There is significant evidence that, even if the historic response rate for much smaller solicitations were obtained, it would simply not be possible to solicit enough households to replace all of LHJ's subscriber base in a short period of time. Hanan's report does not suggest any method which could be used to accomplish this task. If all 5,217,347 of the new subscribers were to be acquired by direct mail solicitation, the number of pieces which would need to be mailed based upon the net response rates for LHJ's 1985 (5.3 percent), mid-1986 (1.9 percent), and December 1986 (2.8 percent) solicitations would be

98,440,509, 274,597,211, and 186,333,821, respectively. If only 55 percent of the new subscribers were to be acquired by direct mail solicitation and the balance were to be acquired from subscription agents, the number of pieces which would need to be mailed would be 54,142,280, 151,028,466, and 102,483,602, respectively. During 1985 and 1986, there were only 30 million mailable households in the United States for purposes of LHJ's direct mail solicitation of new subscribers. We also note that following the 1985 FTC inquiry, the possibility of accomplishing a 5.3-percent net response rate for any direct mail solicitation by LHJ appeared to be questionable. An industry average for direct mail net response rates was approximately 2 percent.

Additionally, the record includes convincing evidence that the cost per new subscriber of obtaining subscribers by direct mail solicitations increases substantially when the solicitation is very large. Consequently, a mass solicitation of new subscribers would result in a cost per new subscriber substantially higher than the historic costs which form the basis for Hanan's valuation. We reject Hanan's approach as not accurately valuing an asset which is comparable to the asset acquired by petitioner. The record convinces us that the basic assumption of Hanan's approach, recreation of the subscriber base in a short period of time, is not possible and, even if possible, would require far more expensive methods than assumed by Hanan.

Grabowski's cost-avoided approach begins with the more reasonable assumption that LHJ could replace its entire subscription base at its historical cost per new subscriber if it did so at the historical rate at which new subscribers were obtained. However, while this may be true, it does not necessarily follow that a reasonable purchaser of the LHJ trademark would in fact choose to acquire subscribers at such a rate. As previously discussed, a large scale direct mail solicitation of new subscribers will increase the cost incurred per new subscriber, but it will also decrease the lost advertising profits taken account of in Grabowski's model. A reasonable buyer of the LHJ trademark would likely attempt to determine the solicitation rate at which the sum of subscription costs and lost advertising profits is minimized. Grabowski's cost-avoided approach does not take account of this consideration. In addition, Grabowski did not adjust the value deter-

mined under his cost-avoided approach to reflect the fact that petitioner would not receive unearned subscription revenues with respect to the current subscription terms of the acquired subscribers.

In his report and in his testimony, Grabowski stated that a buyer would be more likely to rely upon an income approach to value the subscriber relationships than a cost approach. We agree. In reaching this conclusion we note that neither appraiser developed a cost approach which, based upon the evidence presented, accurately reflects the considerations a reasonably informed buyer would take into account in valuing the subscriber relationships acquired by petitioner.

Furthermore, we note that petitioner did in fact determine the amount it was willing to pay for the assets of LHJ using an income approach. We believe that had petitioner bought the LHJ assets without the existing subscribers, it would have used the same income approach, taking into account the adjustments to revenues and expenses resulting from the lack of subscribers. (Hanan's report specifically states that the fair market value of the subscriber relationships equals the "value to Meredith of LHJ with and without relationships with the existing subscribers".)

Based upon the record as a whole, we view the income approach as the most reasonable indication of the amount which would be paid for the subscriber relationships by a willing buyer with reasonable knowledge of relevant facts. Thus, we turn to Grabowski's income approach, and the specific modifications respondent asserts should be made thereto, to value the subscriber relationships.

## 2. *Income Approach to Valuation*

Grabowski's income approach treated the value of the acquired subscribers as equal to the sum of the present values of the subscription income, advertising income, and tax benefits which he determined would be produced by the acquired subscribers. Grabowski estimated the value of the acquired subscribers by the following method: (1) Net subscription income per renewing subscriber was determined based upon historical subscription revenues and expenses and historical list rental income; (2) net monthly advertising revenue per subscriber was determined based upon historical

advertising revenues and expenses; (3) the number of acquired subscribers who would renew their subscriptions and continue as subscribers in each future month was determined based upon renewal statistics; (4) subscription income to be earned from the acquired subscribers in future months was determined by multiplying the number of acquired subscribers renewing in each month by net subscription income per renewing subscriber; (5) advertising income to be earned from the acquired subscribers in future months was determined by multiplying the number of acquired subscribers remaining in each month by net monthly advertising income per subscriber; (6) the total income earned from the acquired subscribers in each future month was discounted to present value; and (7) the present value of future income was increased by the savings due to straight-line amortization of the subscriber relationships. In this analysis, historical revenues and expenses were increased for inflation, and after-tax income was decreased by a capital charge to reflect the implicit use of fixed assets, working capital, and the LHJ trade name.

The specific modifications which respondent alleges should be made to Grabowski's income approach include the following: (1) Deducting the editorial costs associated with the assumed fulfillment obligation from the income attributed to the subscribers; (2) modifying the capital charges made against after-tax income; (3) attributing to goodwill a portion of the revenues treated by Grabowski as attributable to the subscriber relationships; and (4) decreasing the amount of tax benefits included in the value of the subscriber relationships. We also must consider the adjustments to Grabowski's income approach which are appropriate as a result of the conclusions we have reached with respect to the Blyth employment relationship.

### a. *Deduction of Fulfillment Obligation Costs*

As part of its purchase of the LHJ assets, petitioner agreed to assume FMI's obligation to produce and deliver copies of LHJ to existing subscribers. However, FMI retained all payments received from such subscribers with respect to existing subscriptions and remained solely liable to make any cash refunds to existing subscribers who canceled their subscriptions. The parties have stipulated the actual editorial costs

incurred by petitioner through June 30, 1991, for copies of LHJ delivered pursuant to its assumption of FMI's fulfillment obligation. These costs totaled $21,612,766. The stipulation provides that for purposes of this case, petitioner must capitalize these editorial costs. The stipulation also provides that the costs allocated to the advertising portion of such issues may be deducted by petitioner, and the parties generally agree that petitioner is entitled to deduct editorial expenses relating to issues delivered to new and renewing subscribers.

In determining net income attributable to the acquired subscribers, Grabowski did not deduct the editorial costs incurred by petitioner as a result of its assumption of the fulfillment obligation. However, Grabowski did deduct from net income the expenses attributable to the advertising portion of the issues delivered pursuant to the fulfillment obligation and all post-renewal editorial expenses with respect to issues to be sent to renewing acquired subscribers.

Respondent argues that because the costs incurred in satisfying the editorial portion of the fulfillment obligation were "an ordinary and necessary operating expense of the business", the costs must be deducted in applying the income approach to valuation. Respondent points out that the expenditure of these amounts was necessary for petitioner to maintain its relationships with the acquired subscribers. If petitioner had not incurred the expenses to fulfill the existing subscriptions, respondent argues, the relationships with these subscribers would have been lost. Respondent also asserts that for financial purposes the editorial portion of the fulfillment obligation was indistinguishable from the advertising portion and from post-renewal editorial expenses and that the only real difference between these amounts, i.e., their tax characterization, should be irrelevant for valuation purposes. (Pursuant to the stipulation of the parties, total production costs of the issues delivered in satisfaction of the fulfillment obligation were allocated to the editorial portion of the issues based on the ratio of editorial pages to total pages and to the advertising portion of the issues based on the ratio of advertising pages to total pages.)

Petitioner argues that the stipulation requiring the capitalization of expenses related to the editorial portion of the fulfillment obligation makes such expenses, for tax purposes,

part of the purchase price of the assets of LHJ. Petitioner asserts that amounts which constitute purchase price are not properly charged against revenues in applying an income approach to valuation, and petitioner therefore concludes that the editorial expenses in issue should not be charged against revenues in valuing the acquired subscribers. Petitioner believes that the purchase price characterization of the expenses overcomes any characterization of the expenses as necessary operating expenses of the business.

As previously noted, the stipulation filed by the parties requires petitioner to capitalize the editorial costs incurred with respect to the fulfillment obligation. Section 1016(a)(1) provides for an adjustment to the basis of property with respect to "expenditures, receipts, losses, or other items, properly chargeable to capital account". Thus, the stipulation appears to bring the editorial costs incurred in respect of the fulfillment obligation within the scope of section 1016(a)(1). While the literal language of the stipulation fails to state the time as of which such amounts are to be capitalized, the most reasonable interpretation of the language and structure of the stipulation is that such amounts are to be capitalized as of the year in which they were incurred. This approach to the treatment of such expenses is consistent with case law dealing with the treatment of contingent liabilities assumed upon an asset acquisition. See, e.g., *Pacific Transp. Co. v. Commissioner*, 483 F.2d 209 (9th Cir. 1973), vacating and remanding T.C. Memo. 1970–41; *Holdcroft Transp. Co. v. Commissioner*, 153 F.2d 323 (8th Cir. 1946), affg. a Memorandum Opinion of this Court; *David R. Webb Co. v. Commissioner*, 77 T.C. 1134 (1981), affd. 708 F.2d 1254 (7th Cir. 1983); *Yoc Heating Corp. v. Commissioner*, 61 T.C. 168 (1973); *Vaira v. Commissioner*, 52 T.C. 986 (1969), revd. on another issue 444 F.2d 770 (3d Cir. 1971). We interpret the stipulation as adopting this approach to treatment of the editorial portion of the fulfillment obligation.

In reviewing the parties' arguments, we must agree that the costs in dispute are indistinguishable, other than their tax characterization, from costs which were properly deducted by Grabowski in applying his income approach. However, as the purpose of the valuation in these cases is to determine petitioner's tax basis for recovery of its investment, we disagree with respondent's argument that the tax

characterization of the payments is per se irrelevant in applying the income approach. We also generally agree that amounts constituting purchase price are not properly deductible from net revenues in applying an income valuation approach. However, our interpretation of the stipulation prevents the costs in issue from being treated as part of the purchase price as of the date of acquisition. Such amounts are not included in purchase price, and therefore basis, until the year in which they are incurred.

The costs in issue are of a type which should be charged against revenues in applying an income approach absent being characterized as a part of purchase price. The stipulation prevents such amounts from being treated as a part of purchase price as of the date of acquisition. Consequently, we believe that the only treatment of these amounts which is consistent with both the stipulation and the proper application of the income approach is to (1) charge the amounts against revenues in determining petitioner's initial basis under the income approach, and (2) add such amounts to the basis of the subscriber relationships in the years in which such amounts are incurred.

b. *Capital Charges*

In applying the income approach to valuation, Grabowski applied capital charges to after-tax income from subscription and advertising revenues based upon the following percentages:

| Asset | Capital charge as percentage of revenues |
|---|---|
| Fixed assets | 0.13 |
| Working capital | 1.32 |
| Trade name | 2.21 |

(Grabowski's report states that capital charges to after-tax income were made "to reflect the implicit use of the fixed assets, working capital, and the LHJ' trade name necessary to support the renewal subscriber accounts.") Grabowski also excluded a portion of advertising revenues in recognition of petitioner's position with respect to the Blyth employment relationship. This exclusion was based upon the estimates made by MSR of the advertising revenues which were attrib-

utable to the Blyth employment relationship, as discussed above.

In his report, Grabowski determined that the appropriate rate of return on capital for LHJ at the time of the acquisition was 14 percent, and he therefore computed the capital charges using the assumption that each of the assets for which a capital charge was appropriate should generate a 14-percent return on value. More specifically, the percentages were computed by multiplying 14 percent times a value for each of the assets and dividing this figure by the 1985 revenues for LHJ of $114,059,960 (as shown in the Grant Thornton financial statement). With respect to the trade name, Grabowski used the $18 million value allocated to the LHJ trademark by FMI and petitioner. Grabowski used the amounts shown in the Grant Thornton financial statements as of December 31, 1985, for fixed assets and working capital in the amounts of $897,803 and $10,716,171, respectively.

Respondent argues that Grabowski failed to apply capital charges for LHJ's inventory of editorial materials and its workforce, and that Grabowski has understated the capital charge which is appropriate with respect to LHJ's trade name.

Respondent also contends that (1) all of the capital charges computed by Grabowski should be larger because of petitioner's attribution of advertising income to the Blyth employment relationship, and (2) a capital charge should be applied with respect to the value of the noncompetition agreements. As we have rejected petitioner's claims with respect to the Blyth employment relationship and the noncompetition agreements, consideration of these issues is unnecessary.

With respect to respondent's argument that Grabowski failed to apply a capital charge for LHJ's inventory of editorial materials, we note that the Grant Thornton financial statement computation of changes in components of working capital includes an adjustment for the year's change in inventory. It is apparent that this working capital amount includes inventory by way of including cumulative annual changes to inventory. We therefore conclude that Grabowski's capital charges adequately account for LHJ's inventory.

With respect to LHJ's workforce, Grabowski testified that he investigated whether there were any employees other

than Blyth who were worth more than they were being paid, and concluded that there were none. Respondent cites no evidence to establish that the LHJ workforce had value greater than the sum of the compensation paid to the workforce, i.e., extrinsic value (value), but rather argues that because LHJ could not have written, produced, and distributed its issues without the approximately 100 employees other than Blyth, the employees must have had value. However, respondent then states on brief that "the record affords no basis upon which the value of the workforce could be reasonably estimated". With respect to this last statement, we must agree. Based upon his report and testimony, we have found Grabowski's investigation of the business of LHJ to have been generally thorough and accurate. We do not believe that respondent's unsupported allegation that LHJ's workforce had value is sufficient to overcome Grabowski's testimony that his investigation determined that the workforce did not have significant value.

Respondent asserts that the capital charge made by Grabowski for LHJ's trade name was insufficient because Grabowski computed the charge based upon the value of LHJ's trademark. Respondent contends that LHJ's trade name carries value distinct from and in excess of the value of its trademark. Respondent partially supports this position with the assertion that LHJ's trade name encompasses some or all of the value of LHJ's goodwill. We will deal with the treatment of goodwill in our discussion of respondent's arguments regarding attribution of revenues to goodwill. However, we believe that respondent's general assertion that the LHJ trade name has value significantly in excess of its trademark is not supported by the record.

The Act of July 5, 1946 (Lanham Act), ch. 540, 60 Stat. 427 (current version at 15 U.S.C. secs. 1051–1127 (1988)), is the basis for Federal law governing trademarks and trade names. A trademark is defined to include the use of "any word, name, symbol, or device" by a person

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown. [15 U.S.C. sec. 1127.]

A trade name is defined to mean "any name used by a person to identify his or her business or vocation." *Id.*

We note initially that the owners of LHJ appear to have generally operated their businesses under separate corporate names; i.e., Charter Publishing, FMI, and Meredith Corp. The primary use of the name LHJ was to identify a magazine being published by those businesses. This fact suggests that LHJ is primarily a trademark, not a trade name. See *American Foundries v. Robertson*, 269 U.S. 372, 380 (1926); *Madrigal Audio Laboratories, Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986).

Assuming, however, that LHJ may have been used as a trade name as well as a trademark, the record is devoid of any evidence which would establish a value for the trade name in excess of the value of the trademark. Respondent relies solely on testimony of Grabowski that the name LHJ was recognized and valuable and testimony of Hanan that the LHJ trade name included substantial goodwill. However, Grabowski also testified that he believed $18 million to be a reasonable estimate of the total value of the LHJ name. Because of the lack of evidence that LHJ was used as a trade name and because, as explained below, we believe Grabowski's treatment of goodwill to have been appropriate, we reject respondent's argument that Grabowski's capital charge for the LHJ trade name was insufficient.

### c. *Revenue Attributable to Goodwill*

Respondent argues that Grabowski's income approach is effectively a residual method of valuation; i.e., that by use of capital charges, income is first assigned to all other LHJ assets and the remainder is then treated as attributable to the subscriber relationships. Respondent asserts that the resulting value of the subscriber relationships is overstated because no revenue was attributed to goodwill. Respondent also asserts that the portion of revenue attributable to goodwill cannot be readily determined and that therefore none of the advertising revenue should be treated as attributable to the acquired subscribers because it was not received from the subscribers.

We disagree with respondent's characterization of Grabowski's income approach as being a residual method of valuation. A residual method would assign revenue to the acquired subscribers by taking all of the expected future revenues of LHJ and subtracting out amounts attributable to

all other assets of LHJ. Grabowski began with revenues which were specifically related to the subscriber relationships and then made capital charges with respect to assets which were necessary to earn such revenues. These revenues consisted of (1) subscription income from expected renewals by the acquired subscribers, (2) advertising income attributable to the issues expected to be delivered to the acquired subscribers, and (3) rentals of the subscriber list.

The fixed assets and working capital were necessary to produce the issues which would be sent to the acquired subscribers. Additionally, the expected revenues would likely not have been earned had petitioner attempted to deliver issues to the acquired subscribers which did not bear the LHJ trademark. On the other hand, Grabowski did not apply a capital charge for the value of LHJ's goodwill, apparently on the assumption that goodwill was not necessary to produce the revenue taken account of in this income approach. The question is therefore whether receipt of the revenues taken account of in Grabowski's report was dependent upon the presence of LHJ's goodwill.

The Supreme Court in *Newark Morning Ledger Co. v. United States*, 507 U.S. at ____, 113 S. Ct. at 1675, found "the expectancy of continued patronage" to be a definition of goodwill which "provides a useful label with which to identify the total of all the imponderable qualities that attract customers to the business." However, in finding that the subscriber relationships at issue were assets separate and apart from goodwill, the Supreme Court stated that

we now hold that a taxpayer able to prove that a particular asset can be valued and that it has a limited useful life may depreciate its value over its useful life regardless of how much the asset appears to reflect the expectancy of continued patronage * * * [*Id.* at ____, 113 S. Ct. at 1681.]

In *Newark Morning Ledger*, the income approach was applied "by computing the present value of the after-tax subscription revenues to be derived from the 'paid subscribers,' less the cost of collecting those revenues, and adding the present value of the tax savings resulting from the depreciation of the 'paid subscribers.' " *Id.* at ____, 113 S. Ct. at 1682. Advertising revenues were not included in this computation, nor was a charge made for goodwill. The Government raised issues before the District Court regarding "adjustments or

deductions for production costs, overhead expense, etc.," but because the Government failed to offer any evidence at trial with respect to such adjustments, the court found that it had no basis upon which to reduce the taxpayer's evidence of valuation. *Newark Morning Ledger Co. v. United States*, 734 F. Supp. 176, 182 (D.C.N.J. 1990).

The value of the subscriber relationships acquired by petitioner, as with those at issue in *Newark Morning Ledger*, flows from the predictable expectancy of continued patronage by those subscribers. In fact, the defining trait of goodwill and the subscriber relationships is the same; i.e., "the expectancy of continued patronage." It follows from the Supreme Court's holding in *Newark Morning Ledger*, quoted above, that the sole reason why the subscriber relationships are not treated as goodwill is that they can be valued and have a limited useful life which can be estimated with reasonable accuracy. As the expectancy of continued patronage by the acquired subscribers is a necessary part, but not all of, the definition of the subscriber relationship asset, the revenue produced by their continued patronage is other than the product of goodwill. We therefore conclude that Grabowski did not err in failing to make a capital charge for goodwill.

### d. *Tax Benefits Included in Value of Subscriber Relationships*

The last step in Grabowski's income approach was to increase the present value of net income by the savings resulting from amortization of the full value of the subscriber relationships. Grabowski determined the present value of tax savings by discounting quarterly tax savings resulting from straight-line amortization over 42 months. Respondent asserts that the inclusion of such tax savings in the value of the subscriber relationships is a question of fact, not law, and that because there is no evidence in the record that petitioner bargained for such tax benefits, the tax benefits should not be treated as a part of cost within the meaning of section 1012. Alternatively, respondent argues that because the state of the law at the time of the filing of petitioner's FYE 1986 and FYE 1987 returns provided no certainty that such tax benefits would be available, the inclusion of tax benefits should be decreased by 50 percent as a

reasonable estimate of the probability that claimed tax benefits might not be sustained.

Petitioner cites several of our prior cases as establishing the proposition that the legal uncertainty of obtaining tax benefits at the time of reporting the transaction should not be a bar to inclusion of such benefits in determining basis. See *IT&S of Iowa, Inc. v. Commissioner*, 97 T.C. 496, 532–533 (1991); *Citizens & Southern Corp. v. Commissioner*, 91 T.C. 463, 506–507 (1988) affd. without published opinion 900 F.2d 266 (11th Cir. 1990); see also *Peoples Bancorporation v. Commissioner*, T.C. Memo. 1992–285. Petitioner has also cited *Newark Morning Ledger Co. v. United States*, 507 U.S. ____, 113 S. Ct. 1670 (1993), but there is no indication that the specific issue of inclusion of tax benefits was considered. Respondent points out, however, that the issue before us is the amount which "would change hands between a willing buyer and a willing seller * * * both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973). We must admit that it would seem unlikely that a willing buyer would pay full value for tax benefits associated with an asset where there is substantial doubt that such tax benefits would ultimately be allowed. However, based on the record in these cases, we need not resolve any possible conflict between the willing buyer-willing seller standard and our previous cases.

The LHJ acquisition occurred well before the issuance of the trial court decision in *Newark Morning Ledger*. Respondent, however, had previously challenged the amortization of subscriber relationships. See *Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240 (5th Cir. 1973). The record herein contains no evidence regarding the general view of taxpayers, as of the acquisition date, as to the availability of tax benefits from the amortization of subscriber lists.

The only evidence (but significant evidence) which sheds light on this issue is the cash-flow analysis done by petitioner, prior to the acquisition, in determining whether its purchase price for the LHJ assets was within a reasonable range. This analysis included a full accounting of the tax benefits which would result from amortizing the subscriber relationships. The fact that petitioner included amortization of the subscriber relationships in determining a reasonable

purchase price also requires us to reject respondent's argument that petitioner did not bargain for the tax benefits. As this is the only evidence available to us on this issue, we conclude that Grabowski did not err in including in the value of the subscriber relationships the full amount of tax benefits resulting from amortization.

### e. *Adjustments Resulting From Treatment of Blyth Employment Relationship*

As previously noted, Grabowski excluded a portion of advertising revenues in recognition of petitioner's position with respect to the Blyth employment relationship (the "editor advertising exclusion"). However, we have rejected petitioner's position with respect to the Blyth employment relationship. The parties have agreed that if the editor advertising exclusion were to apply only with respect to the first 35 months after the acquisition, Grabowski's income approach would have resulted in a value for the subscriber relationships of $40,300,000. Consistent with our holding as to the valuation of the Blyth employment relationship, we hold that the editor advertising exclusion should not be applied for any period following the acquisition.

### 3. *Conclusion on Valuation of Subscriber Relationships*

Grabowski determined, pursuant to his income approach, that the value of the subscriber relationships as of January 3, 1986, was $37,800,000. Our only adjustments to this valuation are for: (1) The initial exclusion of the editorial portion of the fulfillment obligation, and (2) the addition of amounts which were excluded pursuant to the editor advertising exclusion. Taking account of these adjustments, we find that petitioner's basis in the subscriber relationships as of January 3, 1986, was $14,641,000. However, in computing its depreciation deduction for FYE 1986, petitioner is entitled to add $13,348,000 to its basis in the subscriber relationships, and in computing its depreciation deduction for FYE 1987, it is entitled to add an additional $13,079,300 to its basis. These amounts include the tax savings resulting from their inclusion in amortizable basis because such tax savings are excluded in determining initial basis. The amounts are not subject to a new depreciation schedule, but, rather, are to be

depreciated over the remaining useful life of the subscriber relationships based on a useful life ending 42 months after the acquisition of the subscribers. The computation of these amounts is shown in the appendix. If the parties are unable to agree, either party may move to offer evidence showing appropriate corrections to these figures as part of the Rule 155 computations.

*Decisions will be entered under Rule 155.*

---

APPENDIX

The parties have agreed that the value determined by Grabowski's income approach assuming an editor advertising exclusion during only the first 35 months is $40,300,000, including value attributable to tax savings. Using Grabowski's tax amortization factor of 0.37634, this value would be approximately $25,133,500 prior to the addition of tax savings. This pretax savings figure is decreased by the present value of the stipulated editorial costs (which we compute to be $18,762,500) and is increased by the present value of 35 months of editor advertising exclusion (which we compute to be approximately $2,760,000). Petitioner's initial basis is therefore $9,131,000 prior to the inclusion of tax savings. Increasing this figure by tax savings results in an initial basis of $14,641,000.

The present value of the stipulated editorial costs is computed as follows:

| FYE | Discount period (years) | Stipulated cost incurred | Present value of cost (@14%) |
|------|------|------|------|
| 1986 | 0.25 | $8,324,660 | $8,056,386 |
| 1987 | 1.00 | 7,827,573 | 6,866,292 |
| 1988 | 2.00 | 2,869,118 | 2,207,693 |
| 1989 | 3.00 | 1,462,368 | 987,057 |
| 1990 | 4.00 | 807,267 | 477,967 |
| 1991 | 5.00 | 321,780 | 167,122 |
| | | 21,612,766 | 18,762,517 |

To compute the present value of 35 months of editor advertising exclusion, we took the annual per-subscriber edi-

tor advertising exclusion from Grabowski's report and converted it to a monthly figure. On this basis, the monthly after-tax per-subscriber exclusion was determined to be $0.0225, $0.0424, and $0.0744 for the years 1986, 1987, and 1988, respectively. The present value of 35 months of editor advertising exclusion was then computed as follows:

| Issue month | Number of subscribers | Exclusion per subscriber | Total exclusion | Present value factor | Present value of exclusion |
|---|---|---|---|---|---|
| Feb. 1986 | 3,824,722 | $0.0225 | $86,018 | 0.9828 | $84,534 |
| Mar. 1986 | 3,689,964 | 0.0225 | 82,987 | 0.9714 | 80,615 |
| Apr. 1986 | 3,597,717 | 0.0225 | 80,913 | 0.9602 | 77,694 |
| May 1986 | 3,591,959 | 0.0225 | 80,783 | 0.9491 | 76,675 |
| June 1986 | 3,451,557 | 0.0225 | 77,626 | 0.9382 | 72,828 |
| July 1986 | 3,221,543 | 0.0225 | 72,453 | 0.9274 | 67,191 |
| Aug. 1986 | 2,818,408 | 0.0225 | 63,386 | 0.9167 | 58,105 |
| Sept. 1986 | 2,747,199 | 0.0225 | 61,785 | 0.9061 | 55,984 |
| Oct. 1986 | 2,681,336 | 0.0225 | 60,303 | 0.8957 | 54,011 |
| Nov. 1986 | 2,639,160 | 0.0225 | 59,355 | 0.8853 | 52,549 |
| Dec. 1986 | 2,594,930 | 0.0225 | 58,360 | 0.8751 | 51,072 |
| Jan. 1987 | 2,477,678 | 0.0424 | 105,016 | 0.8650 | 90,842 |
| Feb. 1987 | 2,439,526 | 0.0424 | 103,399 | 0.8551 | 88,412 |
| Mar. 1987 | 2,411,101 | 0.0424 | 102,195 | 0.8452 | 86,374 |
| Apr. 1987 | 2,362,385 | 0.0424 | 100,130 | 0.8354 | 83,653 |
| May 1987 | 2,306,492 | 0.0424 | 97,761 | 0.8258 | 80,732 |
| June 1987 | 2,242,677 | 0.0424 | 95,056 | 0.8163 | 77,593 |
| July 1987 | 2,222,900 | 0.0424 | 94,218 | 0.8069 | 76,022 |
| Aug. 1987 | 2,173,051 | 0.0424 | 92,105 | 0.7976 | 73,460 |
| Sept. 1987 | 2,138,090 | 0.0424 | 90,623 | 0.7884 | 71,445 |
| Oct. 1987 | 2,101,404 | 0.0424 | 89,068 | 0.7793 | 69,409 |
| Nov. 1987 | 2,045,739 | 0.0424 | 86,709 | 0.7703 | 66,791 |
| Dec. 1987 | 1,969,851 | 0.0424 | 83,492 | 0.7614 | 63,572 |
| Jan. 1988 | 1,923,351 | 0.0744 | 143,078 | 0.7526 | 107,685 |
| Feb. 1988 | 1,891,521 | 0.0744 | 140,710 | 0.7440 | 104,682 |
| Mar. 1988 | 1,853,412 | 0.0744 | 137,875 | 0.7354 | 101,390 |
| Apr. 1988 | 1,810,339 | 0.0744 | 134,671 | 0.7269 | 97,891 |
| May 1988 | 1,779,338 | 0.0744 | 132,365 | 0.7185 | 95,106 |
| June 1988 | 1,759,264 | 0.0744 | 130,872 | 0.7102 | 92,948 |
| July 1988 | 1,733,232 | 0.0744 | 128,935 | 0.7020 | 90,517 |
| Aug. 1988 | 1,692,392 | 0.0744 | 125,897 | 0.6939 | 87,365 |
| Sept. 1988 | 1,656,766 | 0.0744 | 123,247 | 0.6859 | 84,539 |
| Oct. 1988 | 1,623,966 | 0.0744 | 120,807 | 0.6780 | 81,910 |
| Nov. 1988 | 1,595,429 | 0.0744 | 118,684 | 0.6702 | 79,543 |
| Dec. 1988 | 1,561,132 | 0.0744 | 116,133 | 0.6625 | 76,935 |
| Total | | | | | 2,760,076 |

The amount to be added back in 1986 in respect of the stipulated editorial costs is $8,324,660 plus the present value of the tax savings resulting from the amortization of such amount. Using Grabowski's amortization factor of 0.37634, the present value of the tax savings is $5,023,400. Consequently, the total adjustment for 1986 is $13,348,000.

Similarly, the amount to be added back in 1987 in respect of the stipulated editorial costs is $7,827,573 plus the present value of the tax savings resulting from the amortization of such amount. Calculating the appropriate amortization factor for 1987 to be 0.40153 (based on quarterly amortization factors over 30 months rather than 42 months), the present value of the tax savings is $5,251,734. Consequently, the total adjustment for 1987 is approximately $13,079,300.